IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
      v.                            )           1:17CR221
                                    )
CHRISTOPHER LEWIS TUCKER,           )
                                    )
            Defendant.              )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

Before the court are motions filed by the United States seeking a third period within which to restore the competency of Defendant Christopher Lewis Tucker, who is pending indictment for multiple child pornography and firearm offenses, and a request for authority to involuntarily administer psychotropic medication pursuant to Sell v. United States, 539 U.S. 166 (2003). (Docs. 61, 64.) Tucker, through appointed counsel, responded in opposition. (Docs. 62, 67.) The court held evidentiary hearings on September 18 and 24, 2019.[1] For the reasons set forth below, the court finds that the Government has met its burden, demonstrating by clear and convincing evidence that the

---

[1] At the September 18, 2019 hearing, Tucker's counsel stated that Tucker had pending a motion "to deny the Government an additional 120-day observation period." (Doc. 71 at 4.) The docket does not reflect the filing of such a motion, but the court nevertheless considers the request to raise the same question presented by the Government: namely, whether the Government has met its burden on its present motions. (See Doc. 62 at 6.)

involuntary administration of psychotropic medication to restore Tucker's competency is appropriate, and that the motions for an additional period of restoration up to four months and involuntary treatment will be granted.

## I.    BACKGROUND

Following the filing of a criminal complaint, Tucker was indicted on May 30, 2017, on five counts: two counts of enticing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction, in violation of 18 U.S.C. § 2251(a) and (e); one count of knowingly transporting child pornography, in violation of 18 U.S.C. § 2252A(a)(1) and (b)(1); one count of possessing a Smith & Wesson revolver and a 7.62x39 millimeter assault rifle, in violation of 18 U.S.C. § 922(g)(3) and 924(a)(2); and one count of knowing receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1).  (Doc. 8.)  The United States superseded the indictment on August 1, 2017.  (Doc. 19.) The new indictment mirrors the original indictment and seeks the forfeiture of Tucker's firearms and ammunition upon conviction of the offense alleged in count four under 18 U.S.C. § 922(g)(3) and 924(a)(2).

By order of Judge William L. Osteen, Jr., on July 17, 2017, Tucker's initial counsel was relieved of further responsibility of representation due to irreconcilable differences, and CJA counsel H.A. Carpenter, IV, was appointed to represent the Defendant.

(Doc. 13.)

Following his appointment, Carpenter met with Tucker at the Guilford County Jail on four occasions by July 28, 2017. (Doc. 22-2 at 1). From these meetings, counsel became concerned about Tucker's competency, noting that his client's "presentation and interactions with counsel [were] unusual." (Id. at 2.) He further noted that Tucker "controlled the entire conversation, remained very agitated throughout the meeting, [was] extremely opinionated regarding all aspects of his case and highly suspicious." (Id.) Carpenter sought the assistance of James H. Hilkey, Ph.D., a licensed psychologist, to meet with Tucker and provide more information on his mental competency. (Id.)

Dr. Hilkey met alone with Tucker at the Guilford County Jail on July 24, 2017. (Doc. 22-1 at 2.) That same day, Tucker filed a motion, pro se, entitled "Motion Under Case Law United States v. Arnold, 106 F.3d 37 (3rd Cir. 1997)," contending that the Government was prohibited from eliciting incriminating information from him in the absence of his counsel and that Dr. Hilkey "asked many times about [his] case" during their meeting. (Doc. 16.) A second meeting between Tucker and Dr. Hilkey was held on August 1, 2017, at which Carpenter was present. (Doc. 22-1 at 2.)

On August 6, 2017, Dr. Hilkey generated a report based on his clinical interviews with Tucker, consultation with his attorney, Carpenter, and an interview with Tucker's parents. (Id.) The

report was also supported by a consultation with Samuel Gray, Psy.D., a psychologist who evaluated Tucker on May 26, 2017, at the request of his initial attorney, a review of clinical interview notes and psychological test data from Dr. Gray, and a phone interview with Jerry Sparger, Ph.D., Tucker's godfather and a retired forensic psychologist. (Id.) Based on his findings, Dr. Hilkey opined that Tucker lacked the ability to "assist counsel in a rational manner" and recommended he "undergo an inpatient forensic examination to further assess his competency." (Id. at 5.) He also made note of his provisional diagnostic impressions, listing both "Delusional Disorder, Persecutory type" and "Adjustment Disorder with mixed anxiety and Depressed Mood." (Id.)

On August 9, 2017, Carpenter moved to have Tucker declared mentally incompetent to assist counsel properly in his defense, as set out in 18 U.S.C. § 4241(a). (Doc. 22.) The motion was supported by an affidavit discussing counsel's interactions with Tucker (Doc. 22-2) as well as Dr. Hilkey's report (Doc. 22-1).

A hearing was conducted on September 6, 2017. The court entered an order on September 20, 2017, declaring Tucker incompetent with respect to his ability to properly assist counsel in his defense and committing Tucker to a facility for a period not to exceed 45 days for a psychological evaluation to determine

his mental competency pursuant to 18 U.S.C. § 4241.[2]  (Doc. 27.)

Tucker was designated to the Metropolitan Correctional Center ("MCC") in Chicago, Illinois, and arrived on October 16, 2017. (Doc. 28.)  His psychological evaluation began upon his arrival, and the clinical psychologist requested a fifteen-day extension to "complete the testing and examination necessary to develop a history, diagnosis, and opinion" (id.), which the court granted (Doc. 29).

From October 16, 2017, through November 29, 2017, Tucker was observed by staff members at MCC in Chicago, Illinois, and was interviewed several times by Allison Schenk, Ph.D., a licensed clinical psychologist with MCC.  (Doc. 30.)  On January 5, 2018, Dr. Schenk filed her report, documenting Tucker's experiences and belief systems.  She found that Tucker "endorsed feeling people were out to harm him or unfairly targeting him" but found that his beliefs "were not consistent with clinically diagnosed delusions." (Id. at 3.)  She noted that on September 5, 2017, prior to his

_____

[2] Tucker has filed several pro se motions (e.g., to suppress evidence (Doc. 23), produce Brady materials (Doc. 25), etc.) following the September 20, 2017 order declaring him incompetent.  Because Tucker was declared incompetent, and because he has been represented by counsel throughout every stage of this matter, the court has not entertained those motions.  McKaskle v. Wiggins, 465 U.S. 168, 183 (1984) (noting that a trial judge need not permit "hybrid" representation); United States v. White, No. 7:08-CR-00054, 2010 WL 1462180, at *1 (W.D. Va. Apr. 12, 2010) ("Although there is a paucity of Fourth Circuit precedent directly addressing this issue, every Circuit Court of Appeals to have considered the phenomenon of a pro se motion filed by a represented party has determined that a court does not have to accept or entertain these motions.").

evaluation, he had become violent and confrontational with his attorney and correctional officers at the Greensboro (N.C.) Jail Center, "screaming threats to sue the officers and yelling to 'not use a needle.'" (Id. at 4.) Following the combative event, he claimed to have been assaulted after complying with demands and "insinuated his attorney ordered the assault after Mr. Tucker fired him." (Id.) On October 31, 2017, Dr. Schenk had asked Mr. Tucker about a discrepancy between his self-report of lacking suicidal ideation and documentation about his risk of suicide. (Id. at 5.) She noted that on the date Tucker was to have been arrested, he allegedly wrote a letter "with suicidal content" where he discussed getting his affairs in order and who should get his belongings, yet he denied having suicidal ideations. (Id.) When Dr. Schenk probed this discrepancy, Tucker "initially denied it and claimed the letter was the FBI's way of punishing him so he would be placed on suicide watch precautions." (Id.) He later admitted to writing the letter and expressed confusion as to why it was interpreted as a suicide letter. (Id. at 9.)

Dr. Schenk also noted that on November 24, 2017, while medication was being administered in Tucker's housing unit at MCC, he requested to be seen by a nurse for a "medical emergency" but also reported he was having "no medical issues." (Id. at 7.) As he walked away from the nurse in the unit, Tucker was reported to have looked around suspiciously and appeared irritable. Finally,

Dr. Schenk observed, the unit officer noted that Tucker was "talking to himself, claiming there [was] a drone out the window, [the] FBI [was] watching him; and doing things to him overnight." (Id.) Dr. Schenk never discussed these statements with Tucker, as he had left the facility by the time she learned this. (Id. at 9.)

Dr. Schenk found that Tucker described his beliefs of being targeted by the government as systemic issues and problematic now that he was the focus of the government. (Id.) She found that Tucker "consistently denied experiencing hallucinations and there were no behavioral observations to suggest he was attending to internal stimuli throughout [her] interactions with him." (Id.) Based on her interviews with Tucker and review of collateral records, Dr. Schenk concluded that "Mr. Tucker's presentation throughout this evaluation is consistent with narcissistic personality disorder" and that he "may continue to be an extremely challenging and exasperating defendant, which is further indicative of a personality disorder, however . . . his decision making and behaviors are governed by his narcissistic personality traits, rather than a mental illness." (Id. at 17.) She considered, but rejected, a diagnosis of "delusional disorder with persecutory themes," finding his irrational beliefs to be a component of narcissistic personality disorder. (Id. at 11.) Ultimately, Dr. Schenk concluded that "Mr. Tucker is competent to

proceed with his case." (Id.)

On February 2, 2018, Carpenter subpoenaed Dr. Hilkey to testify as an expert witness at a hearing to determine Tucker's competency (Docs. 34, 35) and thereafter moved to have Tucker declared incompetent (Doc. 36). In his motion, Carpenter disputed the findings of Dr. Schenk as incomplete, arguing that in reaching her diagnosis she failed to speak with key individuals including Tucker's godfather, Dr. Sparger; Dr. Hilkey; Tucker's mother; and Tucker's siblings. (Id. at 2-3.) Carpenter provided affidavits from Tucker's mother (Doc. 36-1) and brother (Doc. 36-2), as well as a supplemental psychological report by Dr. Hilkey (Doc. 36-3).

In her affidavit, Tucker's mother, Sandra Mosley, discussed her relationship with her son and shared details about her interactions with him. She reported that Tucker claims that "Jesus came to earth and told Chris he has 'special' powers," that law enforcement is out to get him, that he was "abducted by aliens" as a child, and that he was given "great knowledge about certain unknown formulas and equations." (Doc. 36-1 at 2.) She also recounted an incident during Tucker's youth where he and his brother were fishing on Ocean Isle Pier and an unknown man was allegedly "messing with some young boys under a blanket." (Id.) Tucker told his mother about the man, and police were notified. The man was allegedly arrested, and the police indicated that they sought Tucker's testimony against the man. However, the police

later contacted the family and informed them that Tucker's testimony would not be needed because the "man at the pier" had committed suicide. (Id.) On one occasion while incarcerated during the pendency of this case, Ms. Mosley reported, Tucker informed her that he had seen and spoken with the "man at the pier" while he was in Chicago at MCC and the man told her son he would kill him if he testified. Ms. Mosley informed Tucker that the "man at the pier" was dead, to which he responded that he, in fact, works for the government. (Id. at 3.)

In his affidavit, Bradley Tucker discussed his relationship with his brother and his interactions with him at the Orange County (N.C.) Jail on December 24, 2017. (Doc. 36-2.) He noted that "[Tucker] was extremely paranoid; holding up papers to the window and saying he can't talk because there are eyes and ears everywhere." (Id. at 2.) He also noted that Tucker "wrote that it was Bill and Hillary Clinton's fault that he was in custody," "kept repeating the 'man at the pier,'" "talk[s] often about aliens," "is delusional," "claim[s] that he was abducted by aliens from [their] home in Charlotte" who "gave him 'special powers,'" and "believes he is 'an angel.'" (Id. at 1-2.) He further noted Tucker's difficulty with social interactions and finding and maintaining employment. (Id. at 1.)

On February 7, 2018, Dr. Hilkey met with Tucker at the request of Carpenter to re-evaluate his mental competency. Recounting his

interactions in a report filed on February 9, 2018 (Doc. 36-3),
Dr. Hilkey noted that "[Tucker] threatened both Attorney Carpenter
and me with law suits and demanded that he be put in contact with
agents of the Federal Bureau of Investigation and the Central
Intelligence Agency. He stated his proceeding would be attracting
'national attention.'" (Id. at 3.) Based on his interview,
affidavits from Ms. Mosley and Bradley Tucker, Dr. Schenk's
report, review of the motions and letters written by Tucker, and
consultation with counsel involved in the matter, Dr. Hilkey
reaffirmed his initial findings that Tucker suffered from
"Delusional Disorder, Persecutory Type." (Id.)

The court held a hearing on February 14, 2018, to determine
Tucker's competency to stand trial. Defense counsel presented
testimony from Dr. Hilkey, as well as from Brad Tucker and
Ms. Mosley. The Government presented the testimony of Dr. Schenk
who, in consideration of new evidence of Tucker's mental state,
testified that he should undergo further evaluation before his
competency could be determined. (Doc. 39 at 71.) In making its
decision, the court considered the testimony offered at the
hearing, all doctors' reports, and all other matters of record.
(Doc. 38 at 1.)

On February 16, 2018, the court ordered that Tucker be
committed to the custody of the Attorney General for a second
period of evaluation to determine his competency to stand trial.

(Doc. 38.) Tucker was evaluated at the Metropolitan Correctional Center in San Diego, California ("MCC San Diego"). That evaluation led to a report by Alicia Gilbert, Ph.D., a forensic psychologist at MCC San Diego, filed on April 16, 2018. (Doc. 40.) Based on her evaluation of Tucker, and in consideration of other records, Dr. Gilbert found that "[Tucker's] present ability to understand the nature and consequences of the court proceedings brought against him, as well as his ability to properly assist counsel in a defense are substantially impaired by a mental disease or defect." (Doc. 40 at 17.) Dr. Gilbert diagnosed Tucker with "Schizophrenia, Multiple Episodes." (Id. at 14.) In support of her diagnosis, she reported the following:

> Given that Mr. Tucker has routinely refrained from disclosing his concerns because he was worried that we "might think I'm crazy," is paranoid about his food and will refuse his meals, perseverates over odd details, exhibits delusional thinking, is sometimes slow to respond (possibly auditory hallucinations), has a documented history of "talking to himself," reportedly heard a "recorded voice of his father" over a phone call he did not make (possible auditory hallucinations), easily agitated by unknown triggers, isolates himself, hides under his blanket, and disengages when possibly depressed, paranoid and suspicious of others, and refuses medication because he does not think that he is mentally ill can all be symptoms associated with Schizophrenia.

(Doc. 40 at 15-16.)

The court held a hearing on May 9, 2018, and the Government and Tucker's counsel agreed with Dr. Gilbert's report and with the court's intention to commit Tucker to the custody of the Attorney

General for restoration of competency. (Doc. 42 at 1.) The court found that the preponderance of the evidence demonstrates that Tucker "presently suffers from a mental disease or defect that renders him mentally incompetent to the extent that he is not able to understand the nature and circumstances of the proceedings against him or assist properly in his defense. See 18 U.S.C. § 4241(d)." (Id. at 2.) Tucker was remanded to the custody of the Attorney General for placement at a facility to restore his competency. (Id.)

Tucker was housed at the Federal Medical Center in Butner, North Carolina ("FMC Butner"), where he was evaluated, and efforts were undertaken to restore his competency. (Doc. 48.) On November 21, 2018, a forensic evaluation was filed with this court by Adeirdre Stribling Riley, Ph.D., a forensic psychologist at FMC Butner. (Id.) In her report, Dr. Riley diagnosed Tucker with schizoaffective disorder, substance use disorders, and adult antisocial behavior. (Id. at 10-12.) She further found that while "[Tucker] has no deficits in his factual understanding of his charges, he presents with significant persecutory beliefs which interfere with his ability to rationally apply his knowledge and demonstrate a rational understanding of proceedings and rational ability to consult with counsel." (Id. at 13.) While Dr. Riley found that Tucker was not competent to stand trial, she also found that "there is a substantial likelihood Mr. Tucker can be restored

to competency in the foreseeable future with combination psychotropic medication treatment at therapeutic levels as well as individual competency restoration." (Id. at 14.) At the time of her report, Tucker was prescribed "Olanzapine 10 mg (antipsychotic) and Fluoxetine 20 mg (antidepressant) daily." (Id.) Dr. Riley ultimately requested an additional period of evaluation and treatment to continue restoration efforts. (Id.)

In response to Dr. Riley's report, the Government moved for a second period of restoration. (Doc. 49.) Carpenter, in consultation with Dr. Hilkey, did not object to the court ordering an additional 120-day period of treatment. (Id. at 1.) This court found that "the preponderance of the evidence indicates that [Tucker] continues to suffer from a mental disease or defect that renders him mentally incompetent to the extent that he is unable to assist properly in his defense. 18 U.S.C. § 4241(d)." (Doc. 50 at 4.) Consequently, the court ordered that Tucker's period of restoration of competency be extended for an additional 120-day period "to determine whether his competency can be restored, pursuant to 18 U.S.C. § 4241(d)(2)(A)." (Id.)

During this additional period of restoration, Tucker engaged in a physical altercation with staff members at FMC Butner, "bloodying" the nose of one of the staff. (Doc. 71 at 91.) Following this incident, a due process involuntary medication hearing was held on May 1, 2019, to determine if Tucker could be

forcibly medicated pursuant to <u>Washington v. Harper</u>, 494 U.S. 210 (1990). (<u>Id.</u>; Doc. 59 at 3.) During this hearing, however, Tucker voluntarily agreed to an increase in his dosage of olanzapine from 10 mg to 20 mg, and the hearing ended. (Doc. 59 at 3; Doc. 71 at 91.)

Dr. Riley submitted a subsequent forensic evaluation to the court on May 15, 2019, documenting the efforts to restore Tucker to competency. (Doc. 51.) In her report, Dr. Riley reported her diagnosis of "schizoaffective disorder, substance use disorders, and adult antisocial behavior." (<u>Id.</u> at 8.) She found that Tucker had "no deficits in his factual understanding of his charges" but "may be unable to cooperate rationally with his attorney, testify relevantly, or maintain proper courtroom behavior, due to his intermittent medication compliance and possible breakthrough symptoms of psychosis." (<u>Id.</u> at 8-9.) Dr. Riley noted that Tucker had been intermittently compliant with his prescribed medication, Olanzapine 10 mg and Fluoxetine 20 mg. (<u>Id.</u> at 4.) Despite this intermittent compliance, she found that his symptoms "responded well to medication treatment with antipsychotics and antidepressants in the past" and that "[t]here is a substantial probability that his symptoms would be further attenuated with ongoing medication treatment." (<u>Id.</u> at 5-6.) She also reported that "[r]elative functional gains are evident even with the intermittent medication compliance" and that "target symptoms

would be appropriately attenuated with medication treatment at a therapeutic level." (Id. at 7.)  Dr. Riley concluded that "there is a substantial likelihood Mr. Tucker can be restored to competency in the foreseeable future with a consistent combination psychotropic medication treatment at therapeutic levels as well as individual competency restoration" and that six weeks of consistent medication treatment would be essential in restoring Tucker's competence. (Id. at 9.)  According to Dr. Riley, Tucker was "right at the threshold of competency, and likely would have been restored had he complied with medication treatment."  (Id.) Consequently, she recommended an additional period of evaluation and treatment to restore competency and requested an order for the involuntary administration of medication should he continue to be "intermittently compliant with medication."  (Id. at 9-10.)

In response to Dr. Riley's report, the Government filed a motion on June 5, 2019, for a hearing to determine whether Tucker should be involuntarily medicated (Doc. 52), and the court set the matter for a hearing on July 10, 2019 (Docs. 53, 54).  In turn, Carpenter filed "Defendant's Position with Respect to Sell Hearing," objecting to the involuntary administration of medication.  (Doc. 55.)  Carpenter asserted "[o]ne of [Tucker's] greatest fears is the unknown side effects that he may experience as a result of being forced to take anti-psychotic medications." (Id. at 4.)  According to Carpenter, Tucker allegedly gained 108

pounds in the span of 6 to 8 weeks while on his prescribed medication,[3] experienced a deterioration in his ability to focus his eyes to read, and fears the "zombie effect" he sees in others on these medications. (Id. at 5.) Tucker reported a concern that these side-effects would interfere with his ability to assist counsel during trial. (Id. at 9.) Carpenter also directed the court to the conflicting diagnoses of Dr. Hilkey and Dr. Riley, noting Dr. Hilkey's belief that Tucker suffered from delusional disorder and opinion that antipsychotic medication would not be therapeutic. (Id.) Carpenter argued that "[i]f [Tucker's] accurate diagnosis is Delusional Disorder and if restoration by anti-psychotic medication is unlikely in patients with Delusional Disorder, then the defense contends that the government cannot establish the last three prongs [of Sell]." (Id.) Further, he asserted that the known and unknown side-effects of the medication are "obstacle[s] to the government establishing the last three prongs under Sell." (Id. at 10.)

On July 9, 2019, the day prior to the hearing to determine involuntary administration of medicine, Tucker's mother contacted

---

[3] This assertion is disputed by Dr. Graddy, who testified that Tucker weighed approximately 200 pounds upon his arrival to FMC Butner and gained about 60 pounds shortly after arriving. (Doc. 71 at 98-99.) He testified that Tucker has maintained a weight of approximately 260 pounds for much of his time at FMC Butner. (Id.) Dr. Graddy also said he met with the medical team to discuss Tucker's weight, and the team has encouraged Tucker to change his diet and exercise more. (Id.) But "not really until August [presumably 2019] did he really start doing that." (Id. at 98.)

private counsel who agreed to represent Tucker in the matters
before the court. (Doc. 56 at 1.) The new counsel, Michael A.
Grace, Esq., moved to continue the hearing to a future date to
allow him to meet with Tucker and prepare for the hearing. (Id.
at 1-2.) The motion was granted and the hearing was rescheduled
to August 30, 2019.[4]

On July 31, 2019, a forensic addendum and individualized
treatment plan for Tucker was filed with the court by Logan Graddy,
M.D., the Chief Psychiatrist at FMC Butner. (Doc. 59.) Dr. Graddy
reported that Tucker met the criteria for a diagnosis of
"schizophrenia, first episode, currently in partial remission."
(Id. at 1.) Dr. Graddy also accounted for the medicines prescribed
to Tucker and his compliance with his medicinal regiment. He found
the following:

- While housed at MCC San Diego, Tucker was prescribed
  mirtazapine 30 mg nightly (antidepressant/insomnia
  treatment), risperidone 2 mg twice daily (antipsychotic),
  and benztropine 1 mg twice daily (medication for side
  effects of antipsychotics). His compliance with this
  medication is unknown. (Id. at 3.)

- When Tucker first arrived at FMC Butner, he was continued
  on the same medication from MCC San Diego, but he refused

---

[4] Carpenter was permitted to withdraw upon the appearance of Grace and
his partner, Christopher R. Clifton. (Docs. 57, 58, 60, 63.)

to take risperidone because he said it blurred his vision. (Id.)  On July 31, 2018, Tucker requested to start the antidepressant fluoxetine and was prescribed fluoxetine 20 mg daily and olanzapine 10 mg in place of risperidone. Tucker's compliance was "not very good."  (Id.)

- On April 25, 2019, an altercation occurred between Tucker and the staff at FMC Butner, and Dr. Graddy "emergently medicated [Tucker] with Haldol lactate 5 mg and Ativan 2 mg, both given by intramuscular injection."  (Id.)  In reviewing the charts from the beginning of April through the 25th, Dr. Graddy found that Tucker "had taken 16/24 (67%) possible doses of Olanzapine 10 mg; and taken 18/25 (72%) possible doses of Prozac 20 mg."[5]  (Id.)

- On May 1, 2019, Tucker agreed to increase his dosage of olanzapine from 10 mg to 20 mg.  His compliance was reported as "good."  (Id.)  However, two nurses accounted for three separate instances of Tucker attempting to "surreptitiously not take ('cheek') medications."  (Id.)

- Following a meeting between Dr. Graddy and Tucker on June 28, 2019, Dr. Graddy found that records showed "good" compliance with fluoxetine 20 mg and olanzapine 20 mg.

---

[5] Experts in this case use Prozac interchangeably with fluoxetine. Fluoxetine is the generic name for Prozac.  Where possible, the court will refer to fluoxetine.

(Id.)

Dr. Graddy was unable to say definitively at the time of his report whether Tucker should be involuntarily medicated, but he did note that while Tucker was relatively compliant with taking his medication, he could be "self-sabotaging and recalcitrant in his behavior." (Id. at 6.) Dr. Graddy provided a proposed individual treatment plan and attached the "FMC Butner Sell Appendix 2019." (Id. at 8-18.)

On August 9, 2019, the Government moved for a third period of mental health treatment under 18 U.S.C § 4241(d)(2)(A) and withdrew its motion for a Sell hearing for the time being. (Doc. 61.) Tucker's counsel opposed this motion, arguing that there was no basis for further detention. (Doc. 62.) Both parties agreed that an evidentiary hearing was not necessary under § 4241(d)(2)(A).

However, on August 14, 2019, the Government renewed its initial request for a hearing to involuntarily medicate Tucker. (Doc. 64.) In support, the Government referred to an August 14, 2019 memorandum to the court prepared by Dr. Graddy, reporting that he learned that date that Tucker "had taken only one of his last seven doses of daily fluoxetine (antidepressant), and had refused his last two doses of night time olanzapine." (Doc. 64-1.) Dr. Graddy reported he "immediately called the patient to the treatment team room and met with him, along with his nurse" and

19

that Tucker "firmly and unequivocally told us then that he was stopping all of his psychiatric medications going forward" and was "competent to stand trial." (Id.) Dr. Graddy reported that, under the circumstances, he knew of no less intrusive means of restoring competency than involuntary medication. (Id.) Tucker's counsel responded to the Government's motion, arguing that the Government failed to meet the high burden required for involuntary medication. (Doc. 67.)

In preparation for the August 30 hearing, Tucker was moved to the Alamance County jail, where he became involved in a physical altercation and sustained injuries; his attorneys moved to continue the hearing as a result. (Doc. 68.) The court reset the hearing for September 18, 2019. (Doc. 69.)

An evidentiary hearing was held on September 18. The Government offered the testimony of Dr. Riley and Dr. Graddy, as well as their evaluations and treatment plans. Dr. Riley reaffirmed her opinion that Tucker suffers from schizoaffective disorder, distinguishing her diagnosis from that of a delusional disorder because of the presence of hallucinations. (Doc. 71 at 17-20, 24.) She opined that Tucker is not competent to stand trial and recommended involuntary administration should he continue to refuse his medication. (Id. at 25-27.) Regarding competency, she observed that problems with Tucker's ability to work with counsel resolved with the retention of his new attorneys but concluded

that "[Tucker] is not presently competent to proceed primarily due to impairments in rational understanding."[6]  (Id. at 25-26.)  She also reported that on three separate occasions Tucker had been "cheeking" his medication, which she described as "[w]hen individuals don't swallow their medication when provided it at pill line, they may put it in their mouth and throw it away later": two instances in June 2018, one instance in October 2018, and two instances in May 2019.  (Id. at 29-30.)  In speaking to Tucker's compliance with his prescribed medications, Dr. Riley provided this detailed history:

- Around June 13, 2018, Tucker was prescribed risperidone 2 mg, mirtazapine 30 mg, and benztropine 1 mg.  His compliance in June 2018 was less than 15%.  (Id. at 30.)

- His compliance with risperidone 2 mg and mirtazapine 30 mg in July 2018 was 0%.  He was prescribed olanzapine 10 mg on July 31, 2018, to replace risperidone and mirtazapine, and his compliance with olanzapine for the month of July was 100%.  (Id. at 31.)

- Fluoxetine 20 mg was either started July 31, 2018, or July 1, 2018, but Dr. Riley could not provide information on

---

[6] This testimony appears to differ from the opinion expressed in her April 25, 2019 report, where she concluded that Tucker had both a factual and rational understanding of the charges against him but lacked the capacity to consult with counsel. (Doc. 51 at 8.)  The court notes that during the two-day hearing, Tucker comported himself appropriately, appearing to take notes, and conversing quietly with his counsel.

compliance for July.

- In August of 2018, Tucker was 68% compliant with fluoxetine 20 mg and 87% compliant with olanzapine 10 mg. (Id. at 31, 33.)

- In September of 2018, compliance with olanzapine 10 mg was 17%. (Id. at 33.)

- In October of 2018, compliance with olanzapine 10 mg was 65%. (Id.)

- In November of 2018, compliance with olanzapine 10 mg was 100%. (Id.)

- In December of 2018, compliance with olanzapine 10 mg was 97%. (Id.)

- In January of 2019, compliance with olanzapine 10 mg was 84%. (Id.)

- In February of 2019, compliance with olanzapine 10 mg was 43%. (Id.)

- In March of 2019, compliance with olanzapine 10 mg was 10%. (Id.)

- In April of 2019, compliance with olanzapine 10 mg was 73%. (Id.)

- In May of 2019, Tucker's prescribed olanzapine was increased from 10 mg to 20 mg, daily. His compliance with olanzapine 20 mg in May was 100%. (Id.)

- In June of 2019, compliance with olanzapine 20 mg was 97%. (Id.)

- Around July 9, 2019, Tucker's prescribed olanzapine was changed from the regular oral tablet to a dissolvable tablet, both 20 mg daily. His compliance with the regular tablet through July 9, 2019 was 100%. His compliance with the dissolvable tablet was 86%. (Id.)

- From the beginning of August through August 14, 2019, compliance with olanzapine 20 mg was 40%. Tucker has not taken olanzapine since August 14, 2019. (Id.)

When Tucker refused his medicine, a formal meeting was held on August 14, 2019, between Tucker, Dr. Riley, Dr. Graddy, and a BOP nurse where all the BOP staff "tried to convince [Tucker] to take the medication and comply with the treatment plan," but Tucker refused. (Id. at 110.) Dr. Graddy testified that the staff had "exhausted every possible avenue that [he] was aware of to try to get [Tucker] to voluntarily take medication, and [Tucker] was adamant that he would not." (Id.) Dr. Riley testified that Tucker's mental illness has been responsive to treatment and that further treatment with antipsychotic medication was substantially likely to render him competent to stand trial. (Id. at 39-40.) She noted that when unmedicated, Tucker "[held] his head sideways" and presented as someone "tuning into internal stimuli while also trying to respond to their environment," although he denied

auditory hallucinations.  (Id. at 34.)  Dr. Riley also testified that Tucker is unlikely to voluntarily take his medication and that, if left untreated, his prognosis as an individual with a mental illness is "poor."  (Id. at 43-44.)  In response to the court's question as to whether there is a timeframe within which one would ordinarily expect competency to be restored if it is restorable, Dr. Riley stated that the best indicator here is Tucker's response to treatment so far and that after "four to five months" FMC Butner would be able to provide an opinion as to whether Tucker is restorable.  (Id. at 64-65.)

In his testimony, Dr. Graddy reaffirmed his belief that Tucker suffers from schizophrenia and is not competent to stand trial.  (Id. at 73, 79.)  To restore competency, Dr. Graddy recommended that Tucker "resume treatment" with olanzapine and, if taken orally, suggested an initial dosage of 20 mg daily via a dissolvable tablet with a potential increase up to 40 mg daily via a dissolvable tablet based on Tucker's "clinical response, his side effects, and his issues of competence."  (Id. at 80-81.)  If involuntary medication was ordered, Dr. Graddy recommended 300 mg of long-acting injectable olanzapine that would last in Tucker's system for two weeks at a time.  (Id. at 82.)  Dr. Graddy also noted that Tucker is likely a "rapid metabolizer, meaning his system is very effective at breaking this medicine down and keeps the medication at an artificially low level in his bloodstream,"

and so Dr. Graddy expressed his preference for leeway in the particular dosage as well as the frequency of the injections. (Id. at 83-84.)[7]  Ultimately, Dr. Graddy believed that his treatment plan was substantially likely to restore Tucker to competency and would be effective for either a diagnosis of schizophrenia or schizoaffective disorder. (Id. at 99.)  In support of this belief, he cited Tucker's previous success on olanzapine and a study by FMC Butner that tracked the success rate of restoring individuals with schizophrenia, schizoaffective disorder, and delusional disorders to competency. (Id. at 101-02.)  He also testified that olanzapine "is one of the most effective" treatments for schizophrenia and that Tucker's previous success on the medication is indicative of his future success. (Id. at 105.)  Finally, he expressed his opinion, consistent with that of Dr. Riley, that the length of time to restore competency would be "about four months." (Id. at 154.)

Regarding side effects of medication, Dr. Riley testified that Tucker experienced fatigue while previously on medication. (Doc. 71 at 37.)  Dr. Graddy acknowledged the side effects of both the injectable olanzapine and olanzapine in the oral tablet form. He noted that weight gain is a side effect of olanzapine. (Id. at 98.)  Speaking to antipsychotics as a whole, he indicated that

_____

[7] As noted infra, at the hearing the Government made clear it is not requesting this additional flexibility at this time.

they have a risk of neuromuscular side effects and metabolic side effects. Olanzapine in particular appears to "change[] the way that cells metabolize" and can cause weight gain and increased risk of diabetes and high cholesterol. (Id. at 112.) Acute side effects of olanzapine include an acute dystonic reaction (sustained contraction of a muscle group), drug-induced parkinsonism (tremors and slowed movements), akathisia (feeling like one needs to move around), and tardive dyskinesia (repetitive movements, typically of the face or upper body). (Id. at 113-14.) Assuring the court that FMC Butner gives the injectable olanzapine "on a completely routine basis," he acknowledged the possibility of a "rare" event where if the medication is "accidentally injected into a blood vessel, the person can have a period of time where they basically have an overdose of the medicine" and can become confused or even go into a coma for a period of time. (Id. at 82-83.) While "[i]t's never occurred" at FMC Butner, the staff takes precautions, including observing the patients given the injections for 3 hours, as the manufacturer recommends, "to make sure that they don't have one of these episodes." (Id. at 83.) Finally, Dr. Graddy reported that with all anti-psychotics there is a risk of sudden death. (Id. at 116.) He noted, however, that schizophrenia is "a terrible disease" and despite all these risks, across general populations of persons suffering from schizophrenia those who take these medications live longer than those who do

not, "and so treatment helps prolong people's lives." (Id. at 117.)[8]

The evidentiary hearing required a second day and was continued to September 24, 2019. Defense counsel offered the testimony of Dr. Hilkey as well as his forensic reports.[9] Dr. Hilkey reaffirmed his opinion that Tucker suffers from delusional disorder, persecutory type. He also shared his belief that while schizophrenia and schizoaffective disorder are both amenable to psychotropic medication, delusional disorder, persecutory type is not. In his opinion, olanzapine would not treat Tucker's mental illness, but would instead reduce his agitation and sedate him rather than affect his underlying thought processes. In support of his conclusion that Tucker suffers from a delusional disorder, Dr. Hilkey noted that Tucker is organized, well oriented, and lucid, so long as you are not talking with him about the events related to his alleged crimes. In his view, if you don't speak to Tucker about the alleged behavior related to his case, he shows no signs of psychotic symptoms. Dr. Hilkey testified that he never heard Tucker talk about auditory hallucinations, which Dr. Hilkey believed to be a hallmark of

---

[8] Dr. Graddy's report further explains that "many of these side effects can be detected early and addressed before they become serious" and that "the risk of sudden life-threatening side effects due to these medications is very low." (Doc. 59 at 8.)

[9] The transcript of the second day of the hearing was not yet available at the time this opinion was issued.

schizophrenia. When asked about Tucker's insistence that he saw and spoke with the "man at the pier" in Chicago, Dr. Hilkey characterized this as more of a recall or flashback than a hallucination. Ultimately, Dr. Hilkey testified, the medically appropriate treatment for Tucker would be intensive psychotherapy, a process he believed could take several years. He opined, however, that such psychotherapy would require a discussion with Tucker of the merits of his case, which would be difficult, if not impossible, for the Bureau of Prisons to engage in given the Defendant's rights.

At the conclusion of the evidence, the Government asked the court to order that Tucker be involuntarily medicated with 300 mg of olanzapine in the injectable form between every 14 to 10 days and continue to the conclusion of all pretrial and trial proceedings, to ensure his competency for trial. The Government also asked for an additional five-month period of mental health treatment to restore competency under 18 U.S.C. § 4241(d)(2)(A). Tucker's counsel argued that the Government has not met its burden and asked the court to deny its request for involuntary medication and an additional period to restore competency.

## II. ANALYSIS

"The question of when the government may involuntarily administer psychotropic drugs to a defendant for the purpose of rendering him competent to stand trial entails a difficult balance

between the defendant's interest in refusing mind-altering medication and society's interest in bringing the accused to trial." United States v. Chatmon, 718 F.3d 369, 373 (4th Cir. 2013). The determination of whether to grant the Government's motion for involuntary medication is governed by the four-prong standard established in Sell v. United States, 539 U.S. 166 (2003). To justify forced medication, the Government must establish: (1) "that important governmental interests are at stake," such as the Government's interest in prosecuting an individual accused of a serious crime; (2) "that involuntary medication will significantly further those . . . interests" by making it "substantially likely to render the defendant competent to stand trial" and "substantially unlikely to [cause] side effects that will interfere significantly with the defendant's ability to assist counsel;" (3) "that involuntary medication is necessary to further those interests," because "less intrusive treatments are unlikely to achieve substantially the same results," and (4) "that administration of the drugs is medically appropriate," meaning in the defendant's best medical interest. Id. at 180-181; United States v. Bush, 585 F.3d 806, 813-14 (4th Cir. 2009). Each prong of the Sell analysis must be established by clear and convincing evidence. United States v. Watson, 793 F.3d 416, 420 (4th Cir. 2015).

### A.    Important Governmental Interests

Under the first prong, the Government must show there are important government interests at stake and that special circumstances do not sufficiently mitigate those interests. United States v. White, 620 F.3d 401, 410 (4th Cir. 2010) (citing Sell, 539 U.S. at 180). "The Government's interest in bringing to trial an individual accused of a serious crime is important." Sell, 539 U.S. at 180. The Fourth Circuit has held that "the central consideration when determining whether a particular crime is serious enough to satisfy [prong one] is the maximum penalty authorized by statute." Chatmon, 718 F.3d at 374 (internal quotation marks and citation omitted); see also United States v. Evans, 404 F.3d 227, 238 (4th Cir. 2005) ("We think it beyond dispute that the Government does have an important interest in trying a defendant charged with a felony carrying a maximum punishment of 10 years imprisonment."). Special circumstances, however, can lessen the governmental interest in any given case. Sell, 539 U.S. at 180. "The government's interest in prosecution is lessened when the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed . . . .)" White, 620 F.3d at 413-14 (internal quotation marks and citation omitted).

The Government points to Tucker's multiple counts charging child pornography-related offenses and argues that preventing the

exploitation of children is an important governmental interest and that the potential sentences under the statutes at issue reflect the seriousness of the crimes. Beyond that, the Government argues that there are no special circumstances that defeat the governmental interest. In response, Tucker's counsel submits that there are special circumstances that lessen the Government's interest, particularly the fact that Tucker has been in custody for thirty months and the contention of an insanity defense. (Doc. 67 at 6-7.)

In the present case, Tucker is charged with two counts of enticing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction, one count of knowingly transporting child pornography, one count of knowing receipt of child pornography, and one count of possessing a Smith & Wesson revolver and a 7.62x39 millimeter assault rifle, in violation of 18 U.S.C. §§ 2251(a) and (e), 2252A(a)(1) and (b)(1), 2252A(a)(2)(A) and (b)(1), and § 922(g)(3) and 924(a)(2), respectively. As to counts one and two, he faces a mandatory statutory minimum of 15 years and a maximum of thirty years. As to counts three and five, he faces a mandatory statutory minimum of five years and maximum of twenty years. On count four, he faces a statutory maximum of ten years. Given the significant potential sentences and Tucker's current incarceration of thirty months, the court cannot find that his current length of incarceration is a

special circumstance that detracts from the Government's important interest in prosecuting this case. The Evans court found that even after crediting a defendant with two years on a ten-year sentence, the Government still had an important interest in prosecuting a case with a potential eight-year prison term. 404 F.3d at 239. Tucker's thirty months of incarceration may lessen the governmental interest, but it is far from overriding it.

The possibility of civil commitment under 18 U.S.C. § 4246 is similarly not a special circumstance that defeats the important governmental interest. Civil commitment has not yet been litigated. There is the possibility that Tucker could be civilly committed for a lengthy period of time, mitigating the governmental interest. There is also the possibility that he could be released into the community relatively early such that the Government would lose its opportunity to prosecute him for a serious crime. On balance, the possibility of civil commitment does not sufficiently mitigate the governmental interest.

The Fourth Circuit has not yet said definitively whether a possible insanity defense is a special circumstance that mitigates the Government's prosecution interest. Watson, 793 F.3d at 423. Defense counsel directs the court to United States v. Duncan, 968 F. Supp. 2d 753 (E.D. Va. 2013), and United States v. Rodman, 446 F. Supp. 2d 487 (D.S.C. 2006), in support of their argument that the court should consider a possible insanity defense as a special

circumstance for Tucker.   Assuming without deciding that an insanity defense can be a special circumstance, the court notes that the cases cited by defense counsel are distinguishable from the present one.   In Duncan, the Government's own experts believed the defendant had an insanity defense.   968 F. Supp. at 766-67. Similarly, in Rodman, the Bureau of Prisons report prepared for the defendant concluded that the defendant was entitled to an insanity defense.   446 F. Supp. at 497.

In the present case, there has been no evidence that Tucker has an insanity defense.   In his report, Dr. Hilkey writes, "[t]his evaluation is limited to an assessment of Mr. Tucker's competency and does not address issues related to his responsibility or state of mind during the occurrences of the alleged offense behaviors." (Doc. 22-1 at 1.)   The forensic reports submitted as evidence do not speak to the possibility of an insanity defense, and the Government argues that no insanity defense would be available. Indeed, the Defendant's position is that his delusional disorder only manifests itself in connection with any discussion of the pending charges, which of course were not pending at the time of the alleged offenses.   Therefore, on this record, the Defendant's contention of the possibility of an insanity defense is insufficient to undercut the Government's important interests.

The Government has therefore shown by clear and convincing evidence that there is an important governmental interest that is

not mitigated by special circumstances.

**B.  Substantial Likelihood Involuntary Medication Will Significantly Further the Government's Interests**

Under prong two, the Government must show that involuntary medication will significantly further the Government's interests by making it (1) substantially likely to render the Defendant competent to stand trial; and (2) substantially unlikely to have side effects that will interfere significantly with the Defendant's ability to assist counsel at trial. <u>Sell</u>, 539 U.S. at 181.  The proposed treatment plan offered by the Government must be specifically tailored to the Defendant, given his particular medical history and conditions, and not one that is "generally effective against the defendant's medical condition." <u>Watson</u>, 793 F.3d at 424 (internal quotation marks and citation omitted).  The appropriate inquiry is "not whether a proposed treatment plan is likely to work in general, but whether it is likely to work as applied to a particular defendant." <u>Id.</u> at 425.  For a district court to assess whether involuntary medication is permissible, "the government must set forth the particular medication, including the dose range, it proposes to administer" to restore competency. <u>Evans</u>, 404 F.3d at 241.

The Government proposes that Tucker be involuntarily medicated with 300 mg of injectable olanzapine once every ten to fourteen days.  In support of this treatment plan, the Government

relied on the testimony of Dr. Riley, who diagnosed Tucker with schizoaffective disorder, and Dr. Graddy, who diagnosed Tucker with schizophrenia. In discussing antipsychotic medications, Dr. Graddy testified that olanzapine is "extremely effective" for treating both schizoaffective disorder and schizophrenia (Doc. 71 at 86) and that his proposed treatment plan is the "most appropriate" treatment plan for Tucker, whether his diagnosis is schizoaffective disorder or schizophrenia (id. at 99). Defense counsel insists that a diagnosis of schizophrenia and schizoaffective disorder by the Government's experts, a diagnosis of delusional disorder, persecutory type by their own expert, and several previous diagnoses by other professionals raises doubt as to Tucker's precise mental illness, and thus the Government has not met its burden to show that this treatment plan is appropriate for Tucker specifically. Dr. Hilkey testified that antipsychotics, olanzapine in this case, would reduce symptoms of agitation and serve as a sedating drug, but would not treat Tucker's delusions, which he contends are not responsive to antipsychotics.

Several medical professionals, including Tucker's psychologist, Dr. Hilkey, have characterized Tucker's case as difficult and unusual. But testimony from the experts at the hearing helps to clarify whether the treatment plan offered by the Government satisfies the second prong of Sell. In her testimony,

Dr. Riley described schizoaffective disorder as "a psychotic disorder . . . characterized by the individual meeting Criterion A of schizophrenia, which is the presence of hallucinations, delusions, . . . disorganized behavior, or any other categories under schizophrenia Criterion A [along with] a mood component." (Doc. 71 at 16-17.) In contrast, she described delusional disorder as a psychotic disorder where "Criterion A for schizophrenia has not been met, meaning there's been no other evidence of significant behavioral disorganization [or] hallucinations." (Id. at 23.) Dr. Hilkey acknowledged that auditory hallucinations are a hallmark of schizophrenia. In describing schizophrenia and schizoaffective disorder, Dr. Hilkey noted they are characterized by auditory and visual hallucinations and disorganized behavior and thought.

In reviewing the record, the court finds several instances of what appear to be, and what medical professionals have characterized as, hallucinations, as well as disorganized thinking. While at MCC Chicago, Tucker was reportedly "talking to himself, claiming there is a drone out the window, [that the] FBI is watching him; and doing things to him overnight." (Doc. 30 at 7.) At MCC San Diego, it was reported that Tucker had "disordered thinking," and that he believed there was a door located behind some cabinets and that he was "supposed to meet with [the psychologist] in the room behind the cabinets," despite there being

no door and no visual evidence to suggest a door was present. (Doc. 40 at 7.) While in San Diego, Tucker believed he heard his father's pre-recorded voice or that he was not actually speaking to his father on the phone, but Tucker only successfully placed one phone call during his stay, and it was only to his mother. (Id. at 12.) In her report, Dr. Gilbert noted that Tucker might be suffering from auditory hallucinations, given previous reports of talking to himself and his delayed response in conversation. (Id. at 15-16.) In an affidavit provided by Tucker's mother, Tucker told her that he talked to the "man at the pier" in Chicago, despite this man being dead. (Doc. 36-1 at 3.) In her testimony, Dr. Riley described Tucker as "holding his head sideways" and presenting as someone "tuning into internal stimuli while also trying to respond to their environment." (Doc. 71 at 34.) Though Tucker has denied hallucinations, and while several evaluators have described him as guarded and not immediately forthcoming, this evidence of hallucinations nevertheless exists.[10]

The presence of hallucinations has been described as a distinguishing factor between schizophrenia and schizoaffective disorder, on the one hand, and delusional disorders, on the other. Because of Tucker's reported hallucinations, the court finds that

---

[10] Dr. Hilkey testified at the hearing that while Tucker claimed to have seen helicopters outside MCC San Diego, Dr. Hilkey was not inclined to believe him and did not credit Tucker's accounts as genuine.

the Government's plan to treat him for schizophrenia and schizoaffective disorder is a proper manner of treatment.

In support of his diagnosis of delusional disorder, persecutory type, Dr. Hilkey testified that Tucker holds a particular delusional belief system and only shows psychotic symptoms when he is probed on the specific facts of his case. Otherwise, he presents as someone with no mental illness. He suggested that this differs from individuals with schizophrenia where delusional beliefs would permeate multiple aspects of a person's life. But the record shows multiple instances prior to the actions underlying this case where Tucker expressed delusional beliefs separate from the one expressed currently, notably that he is an angel and that he was abducted by aliens from his childhood home. (Doc. 36-1 at 2.) And while Dr. Hilkey, a psychologist, testified that delusional disorders, particularly persecutory types, are not amenable to antipsychotics, the court gives more weight to the testimony of Dr. Graddy, a medical doctor, who concludes, based on his experience and understanding of the literature,[11] that antipsychotics can be effective in treating delusional disorders.

Given the evidence in the record, the court finds that a

---

[11] Indeed, Dr. Hilkey relied on older studies from 1982 to 2007. In contrast, Dr. Graddy referenced "The Sell effect," which is a study from 2013.

treatment plan for schizophrenia or schizoaffective disorder would be appropriate in this case. The court must then determine whether the proposed treatment plan as to Tucker specifically is substantially likely to render him competent and substantially unlikely to have side effects that significantly hinder Tucker's ability to assist counsel at trial.

The Government points to the reports and testimony from the Bureau of Prisons' experts that show Tucker's responsiveness to olanzapine in the past. Both Dr. Graddy and Dr. Riley testified that Tucker's symptoms were only likely to improve with treatment with antipsychotics. Dr. Hilkey believes that antipsychotic medication will subdue Tucker but not treat his delusional belief system.

While on a regiment of olanzapine, Dr. Riley reported that Tucker was "right at the threshold of competency, and likely would have been restored had he complied with medication treatment." (Doc. 51 at 9.) At the time of the report, Tucker was prescribed olanzapine 10 mg in the tablet form, and it was noted that while his symptoms responded well to treatment, his compliance was poor. (Id. at 4, 5-6.) This was subsequently changed to olanzapine 20 mg by dissolvable tablet (to counteract the fact that they learned Tucker was cheeking his medication). While on medication, Tucker "was able to verbalize his thoughts more readily" and "seemed to be able to participate in the basic turn-taking of conversation,

not only able to attend to the information that was presented to him, but to make rational decisions or to apply what he was told in a rational way." (Doc. 71 at 35.)

Defense counsel cites Tucker's length of detention and argues that the Government's failure to restore Tucker to competency should preclude further efforts. While the length of the detention is important and might ordinarily weigh against the Government, it is somewhat mitigated in this case for several reasons. First, it was the <u>Defendant's counsel</u> who suggested to the court, after the Government's expert opined that Tucker was competent and Tucker had been detained for some time, that further competency examinations and commitment were appropriate. (Doc. 34.) Second, the Defendant's counsel <u>supported</u> both the court's decision in May 2018 to commit Tucker for restoration of competency and the court's subsequent decision in November 2018 to extend restoration efforts. (Doc. 42.) Third, the failure to restore competency, on this record, appears largely attributable to Tucker's refusal – unknown until only recently - to comply with the treatment regimen. So, while the period to restore competency has been extended, it was only recently that the Bureau of Prisons (and thus the Government) learned that Tucker had been "cheeking" his medication and thus frustrating the very effort ordered by the court.

The court finds that the record demonstrates that the administration of the drugs is substantially likely to render

Tucker competent to stand trial. The treatment plan calls for Tucker to receive an injectable form of the same medication in the same equivalent dosage he was taking voluntarily in the past and that was effective in treating his symptoms. Notably, Dr. Graddy testified that based on his experience executing <u>Sell</u> involuntary medications orders and his interactions with Tucker, he believes Tucker will voluntarily take his medication orally, the way he has always taken it, and there will be no need for involuntary medication. (<u>Id.</u> at 131-32.) Based on her observations of Tucker, Dr. Riley testified that it would take four to five months of treatment to restore Tucker to competency or know he could not be, and that no other treatment absent medication would be substantially likely to render him competent to stand trial. (<u>Id.</u> at 42, 64-65.) Dr. Graddy testified that he expected Tucker's symptoms to remit after about four months of treatment[12] and that the treatment plan is substantially likely to render Tucker competent to stand trial, whether he has schizoaffective disorder or schizophrenia. (<u>Id.</u> at 99, 154). Dr. Graddy also provided detailed testimony as to the side effects of injectable olanzapine, and antipsychotics in general, and provided convincing evidence as

---

[12] Because four months is the least restrictive period supported by both Dr. Riley and Dr. Graddy to restore Tucker's competency, the court will grant an additional four-month period of restoration. Should the Government believe an additional 30-day restoration period is necessary to restore Tucker to competency, the court's decision is without prejudice to such a request.

to their likelihood to appear in Tucker given Dr. Graddy's previous experience administering the medication to scores of patients. (Id. at 97-98, 112-116.)  Further, he credibly testified that these side effects are manageable, and the court finds that they are not substantially likely to interfere with Tucker's ability to assist counsel at trial.

### C.    Likelihood that Alternative, Less Intrusive Treatment Will Achieve Substantially Same Results

Under prong three, the Government must show that "involuntary medication is necessary because alternative, less intrusive treatments are unlikely to achieve substantially the same results."  Chatmon, 718 F.3d at 375 (internal quotation marks omitted) (citing Sell, 539 U.S. at 181).  The court must also consider less intrusive means for administering the drugs.  Id.

The court finds that there is no alternative, less intrusive treatment to treat Tucker's mental illness.  When asked about alternative treatments, Dr. Riley testified that there "could be adjunctive treatments to go along with the medication," but that not many alternatives exist.  (Doc. 71 at 41-42.)  She also found Tucker to be "symptomatic" and "in need of an antipsychotic medication treatment to restore his competency."  (Id. at 43.) Dr. Graddy also testified that antipsychotic medication is the primary treatment for psychotic disorders and that antipsychotics are generally effective in treating psychotic disorders.  (Id. at

99-100.)

Based on his diagnosis of delusional disorder, persecutory type, Dr. Hilkey testified that the most medically appropriate treatment for Tucker is intensive psychotherapy.[13] But the record shows that antipsychotics are the best available treatment of psychotic disorders like schizoaffective disorder and schizophrenia and are even prescribed to treat delusional disorders. Dr. Graddy referenced articles in his forensic addendum and treatment plan that address the efficacy of treating delusional disorders with antipsychotics[14] (Doc. 59 at 9-10) and testified that individuals with delusional disorders at FMC Butner are restored to competency at rates comparable to individuals treated for schizophrenia and schizoaffective disorder (Doc. 71 at 101-02). Nothing in the record indicates that intensive psychotherapy could treat an individual with schizoaffective disorder or schizophrenia. And given the evidence of hallucinations and the role they play in the diagnoses, the court

---

[13] In his testimony, Dr. Hilkey recommended intensive psychotherapy where professionals can engage Tucker regarding his delusions in order to break them down. However, because Dr. Hilkey contends that Tucker manifests his delusions only when discussing the merits of his case, this would effectively render the Bureau of Prisons incapable of providing treatment in so far as the Bureau of Prisons is a part of the Department of Justice.

[14] A 2007 article by Herbel and Stelmach found that 77% of individuals diagnosed with delusional disorder were restored to competency with the involuntary administration of antipsychotic medication. In a 2012 article by Cochrane et al., referred to in testimony as "The Sell effect," it was reported that 73.3% of individuals with delusional disorder were restored to competency following involuntary medication.

finds that, when Tucker refuses his medication, there are no alternative, less intrusive treatments.

In their brief, Defendant's counsel suggest that less intrusive means exist, notably Tucker's agreement to voluntarily take his medication and comply with treatment as prescribed. (Doc. 67 at 10.) However, the record reflects multiple periods of compliance by Tucker followed by periods of poor compliance where he decides he does not want to take his medication. The Government had initially withdrawn its motion for involuntary medication under Sell but renewed it following the August 14, 2019 memorandum from Dr. Graddy reporting that Tucker "firmly and unequivocally told [Dr. Graddy and Dr. Riley] then that he was stopping all of his psychiatric medications going forward." (Doc. 64-1.)

Another less intrusive mean to consider is "a court order to the defendant backed by the contempt power." Chatmon, 718 F.3d at 375 (quoting Sell, 539 U.S. at 181). In response to questioning by the Government, Dr. Riley predicted that Tucker would "likely object to medication treatment" even if threatened with a contempt order. (Doc. 71 at 43.) The Government also points to the record as a whole to indicate that a court order backed by the contempt power would not be effective. Tucker has been asked previously to take his medication so he could be restored to competency and stand trial, but he refused to do so despite the consequence of more time in Bureau of Prison facilities. He has been confined for

over thirty months and there is nothing in the record indicating that the threat of additional confinement will push him toward compliance with his treatment plan. Because the court concludes that the threat of civil contempt is unlikely to encourage Tucker to take his medication, it does not consider this to be a less intrusive means and finds that there are no less intrusive means that are likely to achieve substantially same result as involuntary medication.

## D. Medical Appropriateness and Defendant's Medical Interest

Finally, the Government must show that the administration of drugs under the proposed treatment plan is medically appropriate and in the Defendant's best medical interest considering all the circumstances relevant to the Defendant in particular. Sell, 539 U.S. at 181. "[T]o assess whether involuntary medication is constitutionally permissible under Sell's . . . fourth factor[], the government must set forth the particular medication, including the dose range, it proposes to administer . . . ." Evans, 404 F.3d at 241. However, this is not enough to comply with Sell. Id. at 242. To show that a proposed treatment plan is medically appropriate, the Government must explain why it chose the particular course of treatment, estimate the length of time it will take to restore competency, and describe the criteria it will use to determine when to stop administering drugs. Id. Beyond that, the Government must weigh the treatment plan's benefits and

side effects, show how it plans to deal with those side effects, and explain why the benefits outweigh the costs of the side effects. Id.

The Government has proposed a treatment plan created by Dr. Graddy that treats Tucker with olanzapine. The dosage amount is 20 mg via a dissolvable tablet daily if taken voluntarily and 300 mg via an injection, the latter of which lasts roughly ten to fourteen days.[15] The Government's experts have provided convincing testimony as to why olanzapine in this dosage is most appropriate for Tucker, including the fact that the symptoms of his mental illness were responsive to treatment and he almost reached competency when he was compliant. The Government has also provided persuasive evidence that, particularly because Tucker was on the verge of competency before he began refusing his medication, competency can be restored in four months of consistent administration of medication.

Dr. Riley testified that she applies the Dusky standard for determining whether competency has been reached. (Doc. 71 at 61-63.) See Dusky v. United States, 360 U.S. 402 (1960) (providing that the test is whether the defendant he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as

---

[15] The range for how long the injectable olanzapine will last in Tucker's body is due to the fact he is a rapid metabolizer.

factual understanding of the proceedings against him"). Specifically, as to Tucker, her "measure for him specifically as to whether or not he is restored is if he can engage in those discussions and consider alternatives in a rational way, whether or not he is able to consult with his attorney, offering his input, considering input by his attorney in a manner without interruption and without intrusions by the delusional ideation, whether or not he can conform his behavior to appropriate courtroom decorum by virtue of demonstrating appropriate behavior when discussing aspects of his case. (Id. at 63.)

The Government has also provided convincing evidence that if it determines Tucker to be competent, it will need to treat his condition on an ongoing basis in order for him to remain competent to stand trial. Therefore, the court finds, by clear and convincing evidence, that continued administration of the medication will be necessary to ensure that Tucker will be able to assist his counsel properly in his defense.

On review of the entire record, the Government has shown by clear and convincing evidence that the proposed treatment plan is in Tucker's best medical interest given his particular medical condition.

## III. CONCLUSION

For the reasons stated, the court finds that the Government has shown, by clear and convincing evidence, that involuntary

medication under <u>Sell</u> is appropriate and that an additional period to restore Tucker to competency through mental health treatment is warranted.

IT IS THEREFORE ORDERED that the Government's motion for an additional period to restore Tucker's competency (Doc. 61) is GRANTED, and the Government shall be provided four months within which to do so.

IT IS FURTHER ORDERED that Tucker take the medication prescribed to him by Dr. Graddy, olanzapine 20 mg dissolvable tablet daily. (Doc. 59 at 5.)

IT IS FURTHER ORDERED that the Government's motion to involuntarily administer medication (Doc. 64) is GRANTED as follows: If Tucker does not comply with his treatment plan despite this court's order, the Government may involuntarily administer 300 mg of olanzapine, injectable form, every ten to fourteen days. If competency is restored, Tucker's medication shall be administered, involuntarily if necessary and at this dosage, through disposition of his criminal charges, including trial.

IT IS FURTHER ORDERED that the treatment staff at FMC Butner are authorized to involuntarily perform any physical and laboratory assessments and monitoring which are clinically indicated to monitor for medication side effects in the event Tucker refuses or is unable to consent to any of these procedures.

IT IS FURTHER ORDERED that if Tucker shall be restored to competency, the Bureau of Prisons shall examine Tucker to determine his competency at the time of the offense, as set forth in this court's prior Order.  (Doc. 38 at 7.)


                                    /s/  Thomas D. Schroeder
                                    United States District Judge
October 22, 2019