IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA          )
                                  )
            v.                    )
                                  )
CHRISTOPHER LEWIS TUCKER          )          1:17CR221


**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, Chief District Judge.

This case is before the court on remand from the Fourth Circuit on the court's prior order to authorize involuntary medication of Defendant Christopher Lewis Tucker to restore competency. (Doc. 137.) Defendant Tucker, who is pending superseding indictment for several child pornography offenses, two of which charge enticement of a minor, and one firearm offense for possessing a 7.62x39 caliber assault rifle, a .32 caliber revolver, and 64 rounds of ammunition as an addicted drug user, also moves for dismissal of the indictment and release from custody. (Doc. 143.) The United States has responded in support of the court's order and in opposition to the motion for release. (Doc. 147.) The court held a hearing on both issues on December 3, 2021. For the reasons set forth below, the court finds that the Government has continued to demonstrate by clear and convincing evidence that the involuntary administration of psychotropic medication to restore Tucker's competency is warranted and that Tucker's motion

for dismissal of the indictment and release from custody will be denied.

## I. BACKGROUND

This case has a complicated and protracted history, which is set out in detail in United States v. Tucker, 417 F. Supp. 3d 702 (M.D.N.C. 2019). Relevant facts will be discussed as pertinent to each pending motion. In particular, the court sets out the history of Tucker's confinements for psychological evaluation given his motion for dismissal and release.

Following the filing of a criminal complaint, Tucker was indicted on May 30, 2017, on five counts of serious criminal activity: two counts of enticing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction, in violation of 18 U.S.C. § 2251(a) and (e); one count of knowingly transporting child pornography, in violation of 18 U.S.C. § 2252A(a)(1) and (b)(1); one count of possessing a Smith & Wesson revolver and a 7.62x39 millimeter assault rifle and ammunition, in violation of 18 U.S.C. § 922(g)(3) and 924(a)(2); and one count of knowing receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1). (Doc. 8.) The United States superseded the indictment on August 1, 2017. (Doc. 19.) The new indictment mirrors the original indictment and seeks the forfeiture of Tucker's firearms and ammunition upon conviction of the offense alleged in count four under 18 U.S.C. § 922(g)(3) and

2

924(a)(2).

On August 6, 2017, James H. Hilkey, Ph.D., a licensed psychologist, generated a report based on his clinical interviews with Tucker, consultation with his initial attorney, CJA counsel H. Alec Carpenter, IV, and an interview with Tucker's parents. (Doc. 22-1 at 2.) The report was also supported by a consultation with Samuel Gray, Psy.D., a psychologist who evaluated Tucker on May 26, 2017, at the request of his attorney, a review of clinical interview notes and psychological test data from Dr. Gray, and a phone interview with Jerry Sparger, Ph.D., Tucker's godfather and a retired forensic psychologist. (Id.) Based on his findings, Dr. Hilkey opined that Tucker lacked the ability to "assist counsel in a rational manner" and recommended he "undergo an inpatient forensic examination to further assess his competency." (Id. at 5.) He also made note of his provisional diagnostic impressions, listing both "Delusional Disorder, Persecutory type" and "Adjustment Disorder with mixed anxiety and Depressed Mood." (Id.)

On August 9, 2017, Carpenter moved to have Tucker declared mentally incompetent to assist counsel properly in his defense, as set out in 18 U.S.C. § 4241(a). (Doc. 22.) The motion was supported by an affidavit discussing counsel's interactions with Tucker (Doc. 22-2) as well as Dr. Hilkey's report (Doc. 22-1).

A hearing was conducted on September 6, 2017, before Judge William L. Osteen, Jr. The court entered an order on September

3

20, 2017, declaring Tucker incompetent with respect to his ability to properly assist counsel in his defense and committing Tucker to a facility for a period not to exceed 45 days for a psychological evaluation to determine his mental competency pursuant to 18 U.S.C. § 4241.[1]  (Doc. 27.)

---

[1] Throughout the history of this case, Tucker has filed several *pro se* motions and appeals (e.g., to suppress evidence (Doc. 23), produce <u>Brady</u> materials (Doc. 25), etc.) following the September 20, 2017 order declaring him incompetent.  Because Tucker was declared incompetent, and because he has been represented by counsel throughout every stage of this matter, the court has not entertained those motions.  <u>McKaskle v. Wiggins</u>, 465 U.S. 168, 183 (1984) (noting that a trial judge need not permit "hybrid" representation); <u>United States v. Ogbonna</u>, 184 F.3d 447, 449 & n. 1 (5th Cir. 1999) (same); <u>United States v. Ziegler</u>, 1 F.4th 219, 226 (4th Cir. 2021) (explaining that "[t]o waive counsel, a defendant must . . . be mentally competent") (citation omitted); <u>United States v. White</u>, No. 7:08-CR-00054, 2010 WL 1462180, at *1 (W.D. Va. Apr. 12, 2010) ("Although there is a paucity of Fourth Circuit precedent directly addressing this issue, every Circuit Court of Appeals to have considered the phenomenon of a *pro se* motion filed by a represented party has determined that a court does not have to accept or entertain these motions."); <u>see</u> Local Rules 7.3, 11.1 (requiring a signature by counsel on all motions by represented parties, and defining a "*pro se*" party as "[a]ny individual who is representing himself or herself without an attorney.").
  The Fourth Circuit's remand order noted that "the district court never docketed" Tucker's pro se appeal (Doc. 44) of this court's order finding him incompetent to stand trial and ordering the first period of restoration.  (Doc. 137 at 2 n.1.)  As Tucker was represented by counsel at the time of his filing and the court had determined Tucker to be incompetent, the court did not entertain the motion.  While it appears that the issues raised in that untimely *pro se* motion to extend time for appeal may well be before the Fourth Circuit in the present case, and in light of the Fourth Circuit having docketed Tucker's other *pro se* notices of appeal (Docs. 114, 127), the court will grant Tucker's motion for extension of time to file notice of appeal, finding excusable neglect based on his representations that he directed counsel to file the notice of appeal (Doc. 44), and the notice of appeal (Doc. 44 at 4) shall be deemed timely filed by Tucker.  Fed. R. App. P. 4(b)(4); <u>see</u> <u>United States v. McCuan,</u> No. 04-CR-40049-DRH, 2007 WL 2410359 (S.D. Ill. Aug. 20, 2007) (unpublished) (granting *pro se* motion for leave to grant extension to file notice of appeal of competency proceedings of incompetent defendant when attorney did not believe it was immediately

Tucker was designated to the Metropolitan Correctional Center ("MCC") in Chicago, Illinois, and arrived on October 16, 2017. (Doc. 28.) His psychological evaluation began upon his arrival, and the clinical psychologist requested a fifteen-day extension to "complete the testing and examination necessary to develop a history, diagnosis, and opinion" (id.), for which the court found good cause and granted (Doc. 29).

From October 16, 2017, through November 29, 2017, Tucker was observed by staff members at MCC in Chicago, Illinois, and was interviewed several times by Allison Schenk, Ph.D., a licensed clinical psychologist with MCC. (Doc. 30.) On January 5, 2018, Dr. Schenk filed her report, documenting Tucker's experiences and belief systems. Dr. Schenk found that Tucker described his beliefs of being targeted by the government as systemic issues and problematic now that he was the focus of the government. (Id. at 9.) She found that Tucker "consistently denied experiencing hallucinations and there were no behavioral observations to suggest he was attending to internal stimuli throughout [her] interactions with him." (Id.) Based on her interviews with Tucker and review of collateral records, Dr. Schenk considered, but rejected, a diagnosis of "delusional disorder with persecutory

---

appealable); see also United States v. Clark, Case No. 08-6198, 2009 WL 1668552 (10th Cir. 2009) (unpublished) (appearing to allow *pro se* notice of appeal of competency determination but requiring future filings to be made through counsel).

themes," finding his irrational beliefs to be a component of narcissistic personality disorder. (Id. at 11.) Ultimately, Dr. Schenk concluded that "Mr. Tucker is competent to proceed with his case." (Id.)

On February 2, 2018, Carpenter subpoenaed Dr. Hilkey to testify as an expert witness at a hearing to determine Tucker's competency (Docs. 34, 35) and thereafter moved to have Tucker declared incompetent (Doc. 36). On February 7, 2018, Dr. Hilkey met with Tucker at the request of Carpenter to re-evaluate his mental competency. Recounting his interactions in a report filed on February 9, 2018 (Doc. 36-3), Dr. Hilkey noted that "[Tucker] threatened both Attorney Carpenter and me with law suits and demanded that he be put in contact with agents of the Federal Bureau of Investigation and the Central Intelligence Agency. He stated his proceeding would be attracting 'national attention.'" (Id. at 3.) Based on his interview, affidavits from Ms. Mosley (Tucker's mother) and Bradley Tucker (Tucker's brother) which detailed Tucker's unusual behavior, Dr. Schenk's report, review of the motions and letters written by Tucker, and consultation with counsel involved in the matter, Dr. Hilkey reaffirmed his initial findings that Tucker suffered from "Delusional Disorder, Persecutory Type." (Id.)

The court held a hearing on February 14, 2018, before the

6

undersigned[2] to determine Tucker's competency to stand trial. Defense counsel presented testimony from Dr. Hilkey, as well as from Bradley Tucker and Ms. Mosley. The Government presented the testimony of Dr. Schenk who, in consideration of new evidence of Tucker's mental state, testified that he should undergo further evaluation before his competency could be determined. (Doc. 39 at 71.) Before issuing its ruling, the court noted Tucker was "in custody a year and we're still trying to determine whether he's competent to stand trial," and that the length of custody was "a legitimate concern because these kind[s] of determinations ought to be made as reasonably swiftly as possible." (Id. at 116.) In making its decision, the court considered the testimony offered at the hearing, all doctors' reports, the requests of the parties, and all other matters of record. (Doc. 38 at 1.)

On February 16, 2018, the court ordered that Tucker be committed to the custody of the Attorney General for placement in a suitable facility for a second period of evaluation to determine his competency to stand trial not to exceed 30 days. (Doc. 38.) Tucker was evaluated at the Metropolitan Correctional Center in

---

[2] On February 5, 2018, this case appeared on the February criminal term according to the district's normal monthly criminal term rotation policy. Because of the developing extensive history of the case, the undersigned accepted assignment of the case to afford the most consistent, efficient, and timely administration possible.

San Diego, California ("MCC San Diego").[3]  That evaluation led to

a report by Alicia Gilbert, Ph.D., a forensic psychologist at MCC

San Diego, filed on April 16, 2018.[4]  (Doc. 40.)  Based on her

evaluation of Tucker, and in consideration of other records,

Dr. Gilbert diagnosed Tucker with "Schizophrenia, Multiple

Episodes."  (Id. at 14.)

The court held a hearing on May 9, 2018, and the Government

and Tucker's counsel agreed with Dr. Gilbert's report and with the

court's intention to commit Tucker to the custody of the Attorney

General for restoration of competency.  (Doc. 42 at 1.)  The court

found that the preponderance of the evidence demonstrated that

Tucker "presently suffers from a mental disease or defect that

renders him mentally incompetent to the extent that he is not able

to understand the nature and circumstances of the proceedings

against him or assist properly in his defense.  See 18 U.S.C.

§ 4241(d)."  (Id. at 2.)  Tucker was thus remanded to the custody

---

[3] Tucker arrived at MCC San Diego on March 6, 2018, but was sent to a
local hospital due to his uncooperative behavior during the intake
process and some concern he may have tuberculosis.  He remained at the
local hospital for one week and returned to MCC San Diego on March 16,
2018, for the beginning of his competency evaluation.  (See Doc. 40.)

[4] Tucker's counsel did not object to the length of his evaluation or
petition any court for relief based on any alleged unreasonable delay
during this time period.  Nor did counsel challenge the court's authority
to order a subsequent period of evaluation.  See United States v. Curbow,
16 F.4th 92, 115 (4th Cir. 2021) (noting that a defendant who wishes to
contest an unreasonable delay under § 4241(d) may "request[]
release . . . from confinement," "raise[] a challenge . . . to the
court's authority to order the second period based on the first-period
lapse," or "[make] a request in the [court of appeals] for mandamus
relief.").

8

of the Attorney General for placement at a facility to restore his competency. (Id.)

Beginning on June 12, 2018, Tucker was admitted at the Federal Medical Center in Butner, North Carolina ("FMC Butner"), where he was evaluated, and efforts were undertaken to restore his competency. (Doc. 48.) During this time, Tucker regularly refused to take his prescribed medication. (Doc. 145 at 3.) He reported experiencing bad dreams, paranoia, and occasional auditory hallucinations. (Id.) Tucker's four-month evaluation period at FMC Butner ended on October 9, 2018 (Doc. 46), and his counsel did not object to or challenge the time period of evaluation at FMC Butner.[5]

On November 21, 2018, a forensic evaluation was filed with this court by Adeirdre Stribling Riley, Ph.D., a forensic psychologist at FMC Butner. (Doc. 48.) In her report, Dr. Riley diagnosed Tucker with schizoaffective disorder, substance use disorders, and adult antisocial behavior. (Id. at 10-12.) While Dr. Riley found that Tucker was not competent to stand trial, she also found that "there is a substantial likelihood Mr. Tucker can be restored to competency in the foreseeable future with combination psychotropic medication treatment at therapeutic levels as well as individual competency restoration." (Id. at

---

[5] See supra note 4.

9

14.) At the time of her report, Tucker was prescribed "Olanzapine 10 mg (antipsychotic) and Fluoxetine 20 mg (antidepressant) daily." (Id.) Dr. Riley ultimately requested an additional period of evaluation and treatment to continue restoration efforts. (Id.)

In response to Dr. Riley's report, the Government moved for a second period of restoration. (Doc. 49.) Carpenter, in consultation with Dr. Hilkey, did not object to the court ordering an additional 120-day period of treatment. (Id. at 1; Doc. 50 at 3-4.) This court found that "the preponderance of the evidence indicates that [Tucker] continues to suffer from a mental disease or defect that renders him mentally incompetent to the extent that he is unable to assist properly in his defense. 18 U.S.C. § 4241(d)." (Doc. 50 at 4.) Consequently, on November 30, 2018, the court ordered that Tucker's period of restoration of competency be extended for an additional 120-day period, until March 29, 2019, "to determine whether his competency can be restored, pursuant to 18 U.S.C. § 4241(d)(2)(A)."[6]  (Id.)

---

[6] During this additional period of restoration, Tucker engaged in a physical altercation with staff at FMC Butner, "bloodying" the nose of one of them. (Doc. 71 at 91.) He was emergently medicated with short acting antipsychotic medication and a benzodiazepine. (Doc. 145 at 3.) Following this incident, a due process involuntary medication hearing was held on May 1, 2019, to determine if Tucker could be forcibly medicated pursuant to Washington v. Harper, 494 U.S. 210 (1990). (Id. at 4; Doc. 59 at 3.) During this hearing, however, Tucker voluntarily agreed to an increase in his dosage of olanzapine from 10 mg to 20 mg, and the hearing ended. (Doc. 59 at 3; Doc. 71 at 91; Doc. 145 at 4.) This is the only instance of Tucker receiving involuntary medication in the record.

Dr. Riley submitted a subsequent forensic evaluation to the court on May 15, 2019, documenting the efforts to restore Tucker to competency. (Doc. 51.) Once again, Tucker's counsel did not object to or challenge the time period of evaluation or timing of Dr. Riley's report.[7] In her report, Dr. Riley reported her diagnosis of "schizoaffective disorder, substance use disorders, and adult antisocial behavior." (Id. at 8.) She found that Tucker had "no deficits in his factual understanding of his charges" but "may be unable to cooperate rationally with his attorney, testify relevantly, or maintain proper courtroom behavior, due to his intermittent medication compliance and possible breakthrough symptoms of psychosis." (Id. at 8-9.) Dr. Riley noted that Tucker had been intermittently compliant with his prescribed medication, Olanzapine 10 mg and Fluoxetine 20 mg. (Id. at 4.) Despite this intermittent compliance, she found that his symptoms "responded well to medication treatment with antipsychotics and antidepressants in the past" and that "[t]here is a substantial probability that his symptoms would be further attenuated with ongoing medication treatment." (Id. at 5-6.) She also reported that "[r]elative functional gains are evident even with the intermittent medication compliance" and that "target symptoms would be appropriately attenuated with medication treatment at a

_____

[7] See supra note 4.

therapeutic level." (Id. at 7.) Dr. Riley concluded that "there is a substantial likelihood Mr. Tucker can be restored to competency in the foreseeable future with a consistent combination psychotropic medication treatment at therapeutic levels as well as individual competency restoration" and that six weeks of consistent medication treatment would be essential in restoring Tucker's competence. (Id. at 9.) According to Dr. Riley, Tucker was "right at the threshold of competency, and likely would have been restored had he complied with medication treatment." (Id.) Consequently, she recommended an additional period of evaluation and treatment to restore competency and requested an order for the involuntary administration of medication should he continue to be "intermittently compliant with medication." (Id. at 9-10.)

In response to Dr. Riley's report, the Government filed a motion on June 5, 2019, for a hearing to determine whether Tucker should be involuntarily medicated (Doc. 52), and the court set the matter for a hearing on July 10, 2019 (Docs. 53, 54). In turn, Carpenter filed "Defendant's Position with Respect to Sell Hearing," objecting to the involuntary administration of medication. (Doc. 55.) Carpenter asserted that "[o]ne of [Tucker's] greatest fears is the unknown side effects that he may experience as a result of being forced to take anti-psychotic medications." (Id. at 4.) According to Carpenter, Tucker allegedly gained 108 pounds in the span of 6 to 8 weeks while on

12

his prescribed medication,[8] experienced a deterioration in his ability to focus his eyes to read, and feared the "zombie effect" he saw in others on these medications. (Id. at 5.) Tucker reported a concern that these side-effects would interfere with his ability to assist counsel during trial. (Id. at 9.) Carpenter also directed the court to the conflicting diagnoses of Dr. Hilkey and Dr. Riley, noting Dr. Hilkey's belief that Tucker suffered from delusional disorder and opinion that antipsychotic medication would not be therapeutic. (Id.) Carpenter argued that "[i]f [Tucker's] accurate diagnosis is Delusional Disorder and if restoration by anti-psychotic medication is unlikely in patients with Delusional Disorder, then the defense contends that the government cannot establish the last three prongs [of Sell]." (Id.) Further, he asserted that the known and unknown side-effects of the medication are "obstacle[s] to the government establishing the last three prongs under Sell." (Id. at 10.)

On July 9, 2019, the day prior to the hearing to determine involuntary administration of medicine, Tucker's mother contacted private counsel who agreed to represent Tucker in the matters

---

[8] This assertion is disputed by Dr. Graddy, who testified that Tucker weighed approximately 200 pounds upon his arrival to FMC Butner and gained about 60 pounds shortly after arriving. (Doc. 71 at 98–99.) He testified that Tucker has maintained a weight of approximately 260 pounds for much of his time at FMC Butner. (Id.) Dr. Graddy also said he met with the medical team to discuss Tucker's weight, and the team has encouraged Tucker to change his diet and exercise more. (Id.) But "not really until August [presumably 2019] did he really start doing that." (Id. at 98.)

13

before the court. (Doc. 56 at 1.) The new counsel, Michael A. Grace, Esq., moved to continue the hearing to a future date to allow him to meet with Tucker and prepare for the hearing. (Id. at 1-2.) The motion was granted, and the hearing was rescheduled to August 30, 2019.[9]

On July 31, 2019, a forensic addendum and individualized treatment plan for Tucker was filed with the court by Logan Graddy, M.D., the Chief Psychiatrist at FMC Butner. (Doc. 59.) Dr. Graddy reported that Tucker met the criteria for a diagnosis of "schizophrenia, first episode, currently in partial remission." (Id. at 1.) Dr. Graddy also accounted for the medicines prescribed to Tucker and his compliance with his medicinal regiment. Dr. Graddy was unable to say definitively at the time of his report whether Tucker should be involuntarily medicated, but he did note that while Tucker was relatively compliant with taking his medication, he could be "self-sabotaging and recalcitrant in his behavior." (Id. at 6.) Dr. Graddy provided a proposed individual treatment plan and attached the "FMC Butner Sell Appendix 2019." (Id. at 8-18.)

On August 9, 2019, the Government moved for a third period of mental health treatment under 18 U.S.C § 4241(d)(2)(A) and withdrew its motion for a Sell hearing. (Doc. 61.) Tucker's

---

[9] Carpenter was permitted to withdraw upon the appearance of Grace and his law partner, Christopher R. Clifton. (Docs. 57, 58, 60, 63.)

counsel opposed this motion, arguing that, without a motion for a Sell hearing, there was no basis for further detention after two and one-half years of evaluating Tucker's competency. (Doc. 62.) Tucker's counsel requested that Tucker be declared incompetent and that the Government instead move for certification under §§ 4246 or 4248. (Id.) Both parties agreed that an evidentiary hearing was not necessary under § 4241(d)(2)(A).

However, on August 14, 2019, the Government renewed its initial request for a hearing to involuntarily medicate Tucker. (Doc. 64.) In support, the Government referred to an August 14, 2019 memorandum to the court prepared by Dr. Graddy, reporting that he learned on that date that Tucker "had taken only one of his last seven doses of daily fluoxetine (antidepressant), and had refused his last two doses of night time olanzapine." (Doc. 64-1.) Dr. Graddy reported he "immediately called the patient to the treatment team room and met with him, along with his nurse" and that Tucker "firmly and unequivocally told us then that he was stopping all of his psychiatric medications going forward" and was "competent to stand trial." (Id.) Dr. Graddy reported that, under the circumstances, he knew of no less intrusive means of restoring competency than involuntary medication. (Id.) Tucker's counsel responded to the Government's motion, arguing that the Government failed to meet the high burden required for involuntary medication. (Doc. 67.)

In preparation for the August 30 hearing, Tucker was moved to the Alamance County (North Carolina) jail, where he became involved in a physical altercation with another inmate and sustained injuries; his attorneys moved to continue the hearing as a result. (Doc. 68.) The court reset the hearing for September 18, 2019. (Doc. 69.)

Motion hearings were held on September 18 and September 24, 2019. The Government offered the testimony of Dr. Riley and Dr. Graddy, as well as their evaluations and treatment plans. At the conclusion of the evidence, the Government asked the court to order that Tucker be involuntarily medicated with 300 mg of olanzapine in the injectable form between every 10 to 14 days and continue to the conclusion of all pretrial and trial proceedings, to ensure his competency for trial. The Government also asked for an additional five-month period of mental health treatment to restore competency under 18 U.S.C. § 4241(d)(2)(A). Tucker's counsel argued that the Government had not met its burden and asked the court to deny its request for involuntary medication and an additional period to restore competency under Sell.

In a 49-page decision, the court analyzed the evidence and Sell factors; noted that the Bureau of Prisons ("BOP") physicians stated that Tucker responded positively to administration of olanzapine in the past, only to relapse when he became non-compliant with his medication; concluded that the Government

16

established each of the four factors by clear and convincing evidence; and ordered the involuntary administration of antipsychotic medication to restore Tucker's competency. (Doc. 73.) The order included a specific dosage of 20 mg of olanzapine as prescribed by Dr. Graddy. The court also granted an additional period of four months to restore Tucker's competency, but later granted Defendant's motion to stay the involuntary medication order "until such time as [the] appeal . . . is resolved." (Doc. 81 at 1.)

Tucker was evaluated at FMC Butner by Dr. Riley and underwent treatment to restore his competency. Dr. Riley issued a report on February 20, 2020, opining that, as a result of his ongoing treatment and medication, Tucker had been restored to competency. (Doc. 83 at 11.) Upon the request of counsel, and as an added measure to protect Tucker's rights, this court took the somewhat unusual step and appointed a guardian *ad litem* for Tucker to assist in his representation.[10] (Doc. 88.) As of June 29, 2020, Tucker's appointed guardian *ad litem* had met with him and "opined that he [was] competent."[11] (Doc. 93 ¶ 8.) Once again, Tucker's counsel

---

[10] About this same time, the novel coronavirus broke out and significantly disrupted all court and BOP operations. Tucker was moved from the BOP to a local jail in May 2020.

[11] But see United States v. Tucker, No. 1:17CR221-1, 2020 WL 3618983, at *5 (M.D.N.C. July 2, 2020) ("[A] professional (or lay) opinion that, while confined, the defendant has become competent to proceed with this case . . . does not establish that, if released from confinement (under

17

did not object to or challenge the length of time Tucker underwent his evaluation at FMC Butner.[12]

While Tucker's appeal at the Fourth Circuit was pending, a status hearing was held in this court on July 1, 2020. Based on the BOP competency report, and at the request of both Tucker's counsel and his guardian *ad litem*, the court ordered that Tucker submit to another competency evaluation by Dr. Hilkey, the Defendant's retained expert, who had earlier examined Tucker at his counsel's request. (Doc. 95.) Dr. Hilkey was ordered to file a report by July 17, 2020. (Id.) The court set the matter for a competency hearing on August 6, 2020, which was rescheduled to September 17, 2020, at the request of the Government (without objection) because of the unexpected illness of Dr. Riley. (Docs. 99, 102.)

The court held competency hearings on September 17 and September 23, 2020. In light of the testimony of Dr. Cunic from FMC Butner, and a previous report filed by Dr. Hilkey, both the Government and Tucker's counsel agreed that Tucker had regressed

---

unspecified conditions), he possesses the stability to appear in court as directed and to refrain from dangerous criminal activity.").

[12] Tucker's counsel filed a motion to reconsider the terms of detention and release, in light of the lay opinions of his restored competence, which was denied. See Tucker, No. 1:17CR221-1, 2020 WL 3618983.

Case 1:17-cr-00221-TDS   Document 151   Filed 12/31/21   Page 18 of 42

and was incompetent to stand trial at that time.[13]  The Government requested an additional 120-day period for restoration of competency, and *again Tucker's counsel did not object*.[14]  Indeed, though the court expressed hesitancy to further delay the proceedings, emphasizing to the parties it was "very interested in seeing [the case] get moved along" because "[i]t is a long time for a defendant to be hanging in the balance on a decision on competency" (Doc. 108 at 96), Tucker's counsel noted that the additional period of evaluation was critical to "hone in on" a correct diagnosis and treatment plan to permanently restore Tucker's competency (Doc. 117 at 66) and assured the court that this was the Defendant's preferred course of action: "I think we have a very difficult case here, and I think we're doing it right. I don't think he's being -- I don't think he's being prejudiced." (Doc. 108 at 96.)

The court found that the preponderance of the evidence demonstrated that Tucker was incompetent at that time and granted the Government's request, supported by the Defendant, for an

---

[13] According to Dr. Cunic, Tucker's regression may have resulted from the failure of the Defendant to have reliably continued the administration of his prescribed medication while in custody at the local jail, or from increased stress due to a recent assault Tucker had sustained while in custody, and/or from his increased isolation due to COVID-19 policies.

[14] In explaining their decision to forgo an objection, Tucker's counsel noted that "We can try [Tucker] any time.  That ain't ever going away. . . . [I]t will always be there to get him a trial."  (Doc. 117 at 65-66.)

additional period of restoration.  (Doc. 112)

Tucker was hospitalized for his reevaluation at FMC Butner on February 23, 2021.  Tucker, through his counsel, *did not object to or challenge the time period of evaluation at FMC Butner*.[15]  On May 7, 2021, the court received the Forensic Evaluation of Dylan Songer, M.A., M.S.  (Doc. 133.)  During his evaluation, Tucker reportedly evidenced delusional ideations after he was removed from quarantine status and "coincidentally the facility went on lockdown."  (Id. at 10.)  In his report, Dr. Songer noted that Tucker believed his case was related to the Federal Intelligence Surveillance Act ("FISA") court and believed it was a "ploy for 'them' to avoid getting in 'big time trouble.'"  (Id. at 12.)  This report concluded that Tucker suffered from schizophrenia, was not competent to stand trial, and could not be restored to competency without medication.  (Id. at 16.)

On September 24, 2021, the Fourth Circuit remanded the case to this court with instructions to further consider its October 2019 Sell order based on what the circuit court deemed "the developing evidence in Tucker's case."  The Fourth Circuit noted it was "unclear at this juncture whether the second Sell factor still weighs in favor of forcible medication."  (Doc. 137 at 5.)

This court ordered Dr. Graddy to promptly update his report,

---

[15] See supra note 4.

based on the developing evidence in this case. (Doc. 142.) Dr. Graddy opined that "[i]nvoluntary medications are substantially likely to contribute to Mr. Tucker becoming competent to stand trial [and]. . . substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense." (Doc. 145 at 9-10.) The court scheduled a hearing for December 3, 2021.[16]

On November 12, 2021, Tucker filed a motion to dismiss the indictment and for release arguing, for the first time in the history of this case, that the Government is beyond the "reasonable period of time" authorized by § 4241 to restore his competency. (Doc. 143 at 15.) Therefore, it was argued, "the statutory authority for the Government to hold Mr. Tucker has expired." (Id.) The Government responded in opposition, arguing that "neither defense counsel nor Tucker [has] raised the issue of excess hospitalization" before, "thereby waiving it," and "[t]he time that has elapsed . . . is substantial, but not unreasonable given the history of the case and seriousness of the charges." (Doc. 147 at 16-17.)

The court's hearing on remand was held on December 3, 2021, for two and one-half hours. The Government offered Tucker's

---

[16] The hearing was originally scheduled for November 17, 2021, but was rescheduled to December 3, 2021, at the request of both parties. (See Docs. 144, 146.)

medical records and the testimony of Dr. Graddy (by video), whom the court finds highly credible. Dr. Graddy testified that the appropriate treatment for Tucker's mental health conditions was 20 to 40 milligrams of olanzapine daily, or 300 mg of olanzapine in the injectable form between every 10 to 14 days. Dr. Graddy emphasized that treatment was substantially likely to render Tucker competent to stand trial, as the BOP has reported it had in the past. At the conclusion of the evidence, the Government renewed its request that the court order, if necessary due to a refusal to voluntarily take his medication, that Tucker be involuntarily medicated with 300 mg of olanzapine in the injectable form between every 10 to 14 days and continue to the conclusion of all pretrial and trial proceedings, to ensure his competency for trial. The Government also asked for an additional period of mental health treatment to restore competency under 18 U.S.C. § 4241(d)(2)(A). In response, Tucker's counsel argued that an involuntary medication order was improper because the "reasonable period" for restoration had lapsed and requested that the motion for release be granted.

## II. ANALYSIS

The case is before the court on limited remand related to consideration of the second factor pursuant to <u>Sell v. United States</u>, 539 U.S. 166 (2003). <u>Doe v. Chao</u>, 511 F.3d 461, 465 (4th Cir. 2007) (noting limited consideration on remand). However, the

22

Fourth Circuit made clear that the court was "free to reconsider whether the remaining Sell factors still weigh in favor of forcible medication." (Doc. 137 at 5 n.2.)

### A. Second Sell Prong

"The question of when the government may involuntarily administer psychotropic drugs to a defendant for the purpose of rendering him competent to stand trial entails a difficult balance between the defendant's interest in refusing mind-altering medication and society's interest in bringing the accused to trial." United States v. Chatmon, 718 F.3d 369, 373 (4th Cir. 2013). The determination of whether to grant the Government's motion for involuntary medication is governed by the four-prong standard established in Sell. To justify forced medication, the Government must establish: (1) "that important governmental interests are at stake," such as the Government's interest in prosecuting an individual accused of a serious crime; (2) "that involuntary medication will significantly further those . . . interests" by making it "substantially likely to render the defendant competent to stand trial" and "substantially unlikely to [cause] side effects that will interfere significantly with the defendant's ability to assist counsel;" (3) "that involuntary medication is necessary to further those interests," because "less intrusive treatments are unlikely to achieve substantially the same results," and (4) "that administration of the drugs is

23

medically appropriate," meaning in the defendant's best medical interest. <u>Sell</u>, 539 U.S. at 180-181; <u>United States v. Bush</u>, 585 F.3d 806, 813-14 (4th Cir. 2009). Each prong of the <u>Sell</u> analysis must be established by clear and convincing evidence. <u>United States v. Watson</u>, 793 F.3d 416, 420 (4th Cir. 2015).

Under prong two, the Government must show that involuntary medication will significantly further the Government's interests by making it (1) substantially likely to render the Defendant competent to stand trial; and (2) substantially unlikely to have side effects that will interfere significantly with the Defendant's ability to assist counsel at trial. <u>Sell</u>, 539 U.S. at 181. The proposed treatment plan offered by the Government must be specifically tailored to the Defendant, given his particular medical history and conditions, and not one that is "generally effective against the defendant's medical condition." <u>Watson</u>, 793 F.3d at 424 (internal quotation marks and citation omitted). The appropriate inquiry is "not whether a proposed treatment plan is likely to work in general, but whether it is likely to work as applied to a particular defendant." <u>Id.</u> at 425. For a district court to assess whether involuntary medication is permissible, "the government must set forth the particular medication, including the dose range, it proposes to administer" to restore competency. <u>United States v. Evans</u>, 404 F.3d 227, 241 (4th Cir. 2005).

At the remand hearing, the Government renewed its proposal that, if necessary due to a continued refusal to voluntarily take his medication, Tucker be involuntarily medicated with 300 mg of injectable olanzapine once every 10 to 14 days. In support of its treatment plan, and in light of the developing evidence in this case, the Government relied on the testimony of Dr. Graddy. In response to the Fourth Circuit's remand about the proper medication and dosage in light of the testimony of Dr. Cunic,[17] Dr. Graddy testified that 20 to 40 mg of olanzapine is the appropriate treatment for Tucker based on evidence that he previously attained competency while *voluntarily* taking 30 mg of olanzapine. Dr. Graddy testified that this range is within the range that may be safely prescribed. The exact dosage will be determined through monitoring the level of medication with blood tests, with Dr. Graddy noting that Tucker's individual characteristics and metabolism may require "a little bit higher dose than most people."[18] The Government accordingly moved the court to amend its

---

[17] See Doc. 137 at 5 ("[T]here is some evidence from Dr. Cunic's testimony that the dosage or type of antipsychotic originally prescribed by Dr. Graddy is not sufficient to restore Tucker to competency.").

[18] Dr. Graddy recommended this range because "There's a variability in terms of response to psychiatric medications. So by giving a range of medication, it gives [the doctor] some latitude to titrate the dose based on the patient's response and their serum blood levels." He also noted that "the dose that I think he requires is within the range of what I originally recommended" (20 to 40 mg). The court previously noted that Dr. Graddy found Tucker to be a "rapid metabolizer." Tucker, 417 F. Supp. 3d at 715.

previous involuntary medication order from "olanzapine 20 mg" to "olanzapine 20-40 mg" based on this consistent recommendation from Dr. Graddy. (Doc. 147 at 19.) Dr. Graddy opined that a treatment plan with olanzapine is "medically appropriate" for Tucker, and that olanzapine has previously rendered Tucker competent, so it is substantially likely to render him competent again to stand trial.

In reviewing the record again, the court finds several instances of what appear to be, and what medical professionals have characterized as, hallucinations, as well as disorganized thinking. While at MCC Chicago, Tucker was reportedly "talking to himself, claiming there is a drone out the window, [that the] FBI is watching him; and doing things to him overnight." (Doc. 30 at 7.) At MCC San Diego, it was reported that Tucker had "disordered thinking," and that he believed there was a door located behind some cabinets and that he was "supposed to meet with [the psychologist] in the room behind the cabinets," despite there being no door and no visual evidence to suggest a door was present. (Doc. 40 at 7.) While in San Diego, Tucker believed he heard his father's pre-recorded voice or that he was not actually speaking to his father on the phone, but Tucker only successfully placed one phone call during his stay, and it was only to his mother. (Id. at 12.) In her report, Dr. Gilbert noted that Tucker might be suffering from auditory hallucinations, given previous reports of talking to himself and his delayed response in conversation.

26

(Id. at 15-16.)  In an affidavit provided by Tucker's mother, Tucker told her that he talked to the "man at the pier" in Chicago, despite this man being dead.  (Doc. 36-1 at 3.)  In her 2019 Sell hearing testimony, Dr. Riley described Tucker as "holding his head sideways" and presenting as someone "tuning into internal stimuli while also trying to respond to their environment."  (Doc. 71 at 34.)  Though Tucker has denied hallucinations, and while several evaluators have described him as guarded and not immediately forthcoming, this evidence of hallucinations nevertheless exists.[19] In March 2021, while undergoing further evaluation at FMC Butner, Tucker reportedly evidenced delusional ideations after he was removed from quarantine status and "coincidentally the facility went on lockdown."  (Doc. 133 at 10.)  In his report, Dr. Songer noted that Tucker believed his case was related to the FISA court and believed it was a "ploy for 'them' to avoid getting in 'big time trouble.'"  (Id. at 12.)

Given the evidence in the record, the court finds clear and convincing evidence that a treatment plan for schizophrenia or schizoaffective disorder would be appropriate in this case.[20]  The

---

[19] Dr. Hilkey testified at the hearing that while Tucker claimed to have seen helicopters outside MCC San Diego, Dr. Hilkey was not inclined to believe him and did not credit Tucker's accounts as genuine.

[20] As the court previously noted, though Dr. Graddy diagnosed Tucker with schizophrenia and Dr. Riley diagnosed him with schizoaffective disorder, Dr. Graddy testified that his treatment plan would be effective for either diagnosis.  Tucker, 417 F. Supp. 3d at 715-16, 719-20.

27

court must then determine whether the proposed treatment plan as to Tucker specifically is substantially likely to render him competent and substantially unlikely to have side effects that significantly hinder Tucker's ability to assist counsel at trial.

The Government relies on the reports and testimony from the BOP's experts that show Tucker's responsiveness to olanzapine in the past and the ability to monitor his medication level with blood draws. Defense counsel cites Tucker's length of detention and argues that the Government's failure to restore Tucker to competency should preclude further efforts. As discussed in this court's previous <u>Sell</u> order, while the length of the detention is important and might ordinarily weigh against the Government, it is somewhat mitigated in this case for several reasons. First, it was the <u>Defendant's counsel</u> who suggested to the court, on several occasions throughout the history of this case, that further competency examinations and commitment were appropriate. (<u>See,</u> <u>e.g.</u>, Doc. 34; Doc. 39 at 116; Doc. 117 at 66.) Second, the Defendant's counsel <u>supported</u> the court's decision in May 2018 to commit Tucker for restoration of competency, the court's subsequent decision in November 2018 to extend restoration efforts, and the court's decision for a fourth period of competency restoration in 2021. (Doc. 42; Doc. 108 at 96.) Third, the failure to restore competency, on this record, appears largely attributable to Tucker's refusal to comply with the treatment

28

regimen, thus frustrating the very effort ordered by the court. There is evidence in the record that, while potentially restored to competency for periods of time, Tucker has nevertheless intentionally refused his medication to influence the proceedings. (See Doc. 59 at 3 (documenting several attempts by Tucker to "cheek" the medication); Doc. 108 at 80-81 (testimony he intentionally refused medication to "get back to court"); Doc. 145 at 4-5 (refusing medication).)

The court finds that, in light of the developing evidence since the court's initial involuntary medication order, the record demonstrates that the administration of the drugs is substantially likely to render Tucker competent to stand trial. The treatment plan calls for Tucker to receive an injectable form of the same medication in the same equivalent dosage he was taking voluntarily in the past and that was reported to be effective (by both doctors and Tucker's guardian *ad litem*) in treating his symptoms. Based on his observations of Tucker, Dr. Graddy testified that it would take four to six months of treatment to restore Tucker to competency and noted in his updated report that no other treatment absent medication would be substantially likely to render Tucker competent to stand trial. (Doc. 145 at 10.) Dr. Graddy testified that he expected Tucker's symptoms to remit after about four months of treatment and that the treatment plan is substantially likely to render Tucker competent to stand trial.

29

Dr. Graddy has also provided detailed testimony as to the side effects of injectable olanzapine, and antipsychotics in general, and provided convincing evidence as to their likely failure to significantly appear in Tucker given Dr. Graddy's previous experience administering the medication to scores of patients and his observation of Tucker's reaction to an increase in medication. As to Tucker's complaints about weight gain, the record reflects that Tucker's allegation of having gained 108 pounds is grossly overstated and his weight gain is attributable at least in part to his refusal to engage in recommended dietary and exercise programs.[21] Further, Dr. Graddy credibly testified that these side effects are manageable, and the court finds that they are not substantially likely to interfere with Tucker's ability to assist counsel at trial. Dr. Graddy's most recent testimony echoes the examiners' consistent opinions that sustained treatment with the prescribed dosage of olanzapine is substantially likely to render Tucker competent to stand trial and substantially unlikely to interfere with his ability to assist counsel. (See, e.g., Doc. 83 at 10-11 (Dr. Riley); Doc. 113 at 6-7 (Dr. Cunic); Doc. 133 at 16 (Dr. Songer); Doc. 145 (Dr. Graddy).)

Therefore, on review of the entire updated record, the court finds that the Government has shown by clear and convincing

---

[21] See supra note 8.

evidence that the proposed treatment plan, including forcible medication of 300 mg of olanzapine, injectable form, every 10 to 14 days as prescribed to him by Dr. Graddy, is substantially likely to render Tucker competent to stand trial and substantially unlikely to cause side effects that would interfere significantly with Tucker's ability to assist counsel.

### B.    Remaining <u>Sell</u> Factors

The Fourth Circuit in its remand order noted that the court was "free to reconsider whether any of the remaining <u>Sell</u> factors still weigh in favor of forcible medication." (Doc. 137 at 5 n.2.) The court has carefully assessed the remaining <u>Sell</u> factors in light of the record to date and finds that developments in the case do not alter the court's prior <u>Sell</u> conclusions.  The governmental interests remain important, particularly as the charges involve enticement of minors and carry a mandatory minimum term of imprisonment of 15 years and maximum of 30 years.  There is also evidence that Tucker has been purposefully non-compliant with his medication, thus frustrating the efforts to achieve competency, which the BOP had reported occurred during his periods of compliance.  This may be related to the fact that in its May 3, 2021 report, the BOP noted that it did not appear that Tucker would meet the criteria for civil commitment under 18 U.S.C. § 4246. (Doc. 133 at 16; <u>see</u> note 24 <u>infra</u>.)  Thus, while the court in its October 22, 2019 <u>Sell</u> order noted the possibility of a civil

31

commitment, 417 F. Supp. 3d at 718-19, it does not appear to be a special circumstance that would allow for Tucker to be confined otherwise. Bush, 585 F.3d at 815.

Since the stay of the Sell order, Tucker has been subject to multiple periods for evaluation for competency, and his examiners consistently opine that treatment with psychotropic medication is medically appropriate. (See, e.g., Doc. 83 at 10-11 (Dr. Riley); Doc. 113 at 6-7 (Dr. Cunic); Doc. 133 at 16 (Dr. Songer).) The application of the medication plan for Tucker is not merely hypothetical, nor is it based on weak evidence. Rather, the record provides actual evidence of the efficacy of the proposed treatment for Tucker personally and its likelihood of successfully restoring him to competency. (See, e.g., Doc. 83 at 11 (Dr. Riley opining that, as a result of his ongoing treatment and medication, Tucker had been restored to competency); Doc. 93 ¶ 8 (Tucker's appointed guardian ad litem had met with him and "opined that he [was] competent"); Cf. United States v. White, 620 F.3d 401, 408 n.4, 421 (4th Cir. 2010) (noting that doctor never examined the defendant, never personally treated any patient with the defendant's disease, and based opinions on other patients with other disorders).) No alternative, less-intrusive means likely to achieve substantially the same result have been identified. See Tucker, 417 F. Supp. 3d at 722-24 (discussing possible alternatives, but ultimately finding "that there are no less

32

intrusive means that are likely to achieve substantially same result as involuntary medication."). Finally, Dr. Graddy has personally examined Tucker and overseen his case, and the doctor's proposed medication plan remains medically appropriate. (See generally Doc. 145 ("Update to Forensic Addendum and Treatment Plan" and "FMC Butner Sell Appendix 2021").) As noted, BOP doctors have testified that the medication has restored Tucker's competency when taken voluntarily by Tucker as prescribed.

## C. Defendant's Motion for Release

Tucker argues for his immediate release from federal custody on the grounds that "the statutory authority for the Government to hold Mr. Tucker [has] expired" and "the Government may not continue to hold an incompetent person indefinitely." (Doc. 143 at 11, 14.) The Government responds that Tucker has waived his objection to the length of his evaluation periods by failing to raise the issue at an earlier stage, and that while "[t]he time that has elapsed since the Court's initial finding under [§]4241(d)(2)(A) in November 2018 is substantial" it is "not unreasonable given the history of the case and seriousness of the charges." (Doc. 147 at 16-17.) During the remand hearing, Tucker's counsel replied by arguing the court should consider "the overall period of confinement" when analyzing "reasonableness" under § 4241(d).

Tucker's motion to dismiss was not raised in the Fourth Circuit, and thus that court did not address the reasonableness of

33

the length of Tucker's evaluation process and whether Tucker should be released from Government custody. Tucker has remained in Government custody for an additional two years while his appeal of this court's <u>Sell</u> order has been pending. Of course, this court could not proceed on the merits while Tucker was declared incompetent. However, consideration of Tucker's current motion for release can be considered and does not exceed the scope of the remand or violate the mandate of the Fourth Circuit. <u>See</u> <u>Doe</u>, 511 F.3d at 465 (explaining that the "mandate rule" prohibits consideration of "First, 'any issue conclusively decided by this court on the first appeal . . .' and second, 'any issue that could have been but was not raised on appeal.'" (quoting <u>United States v. Husband</u>, 312 F.3d 247, 250-51 (7th Cir. 2002))).

In its recent opinion in <u>United States v. Curbow</u>, the Fourth Circuit has explained that "all proceedings under §§ 4241, 4246, and 4248 should move forward with dispatch and not further exacerbate the grim delay in achieving the resolution of these matters." <u>Curbow</u> 16 F.4th at 111 n. 6 (internal quotation and citation omitted). Tucker's argument relies heavily on the Fourth Circuit's decision in <u>United States v. Wayda</u>, 966 F.3d 294 (4th Cir. July 27, 2020) (holding that a six-month delay between a court's unrestorability determination under § 4241 and government's filing of certificate to have a defendant civilly committed under § 4248 was not reasonable). However, as the Fourth

34

Circuit noted, the contention that the court should focus on the "entire-period-of-custody" to determine reasonableness under § 4241 "is based on a misinterpretation of . . . <u>Wayda</u>." <u>Curbow</u> 16 F.4th at 110. The Fourth Circuit has emphasized that "we do not interpret our <u>Wayda</u> decision to establish . . . a standard that would disqualify a defendant from § 4246 or § 4248 certification based on an unreasonable delay in <u>any</u> period of § 4241(d) custody." <u>Id.</u> at 114 (emphasis added). Rather, the proper inquiry is whether the Government acted with "reasonable speed" to conduct the next step in the competency determination or certification process. <u>Id.</u> at 112; <u>see</u> <u>Wayda</u>, 966 F.3d at 308 explaining that "reasonable explainable administrative delays in [the] certification process" are allowed); <u>see also</u> <u>Curbow</u> 16 F.4th at 111 n. 6 ("Although our focus in <u>Wayda</u> was on the period following the unrestorability determination, we in no way excused delays in earlier periods of § 4241(d) custody or excluded the possibility that such delays may be determinative in other cases."). Thus, the Government must act with "reasonable speed," but it is not required to act in the "quickest-possible-manner." <u>Curbow</u> 16 F.4th at 112.

Additionally, if a defendant fails to object to the length of a period of § 4241(d) custody, that objection is considered waived. <u>See</u> <u>id.</u> at 117 (holding that a defendant "waived the theory that he was ineligible for § 4246 certification based upon unreasonable

delays in his first two periods of § 4241(d) custody" because the eligibility provisions are claim-processing rules and not subject matter jurisdictional). A defendant may timely challenge the period of § 4241(d) custody by "request[ing] release in the [district] court from . . . confinement," "rais[ing] a challenge . . . to the court's authority to order [a subsequent] period based on the [previous] period lapse," or "invok[ing] the collateral order doctrine and fil[ing] an appeal in the appropriate court of appeals" or "[making] a request in the [court of appeals] for mandamus relief." Id. at 115. A defendant may not refrain from objecting to such time periods only to later challenge the time periods in their totality. See id. at 116 ("[The defendant] wishes to return to his [home] with the unrestorability determination in place so that he will never be subject to trial. . . . Although [the defendant's] goal is understandable, he cannot properly ask the . . . Court to belatedly adjudicate in these civil commitment proceedings issues that he should have pursued [previously].").

Here, the court finds Tucker waived his theory that his previous periods of custody were unreasonable. During the long and complicated history of this case, Tucker has been subject to separate periods of evaluation for competency.[22] However, prior

---

[22] Tucker's counsel is incorrect to the extent they challenge the periods

36

to the filing of this motion, Tucker's counsel has not previously objected to the reasonableness of the length of any of these time periods, requested release during his "unreasonable" length of confinement for evaluation, or petitioned the Fourth Circuit for relief. See United States v. Olano, 507 U.S. 725, 733 (1993) (defining "waiver" as "the intentional relinquishment or abandonment of a known right") (internal quotation marks omitted); see also Curbow 16 F.4th at 117 (noting that "a determination of waiver would [not] be unjust" where a defendant "is and has continuously been represented by counsel responsible for choosing his legal strategy and protecting his interests."). To the contrary, in the September 2020 competency hearings, Tucker's counsel emphasized that a fourth period of competency restoration was justified to "hone in on" a correct diagnosis and proper treatment plan to permanently restore Tucker's competency. (Doc. 117 at 66.) Additionally, in response to the court's concern about

_____

of evaluation by measuring the timeframe from the court's order to when the report is ultimately filed. While unpublished opinions of the Fourth Circuit are not precedential and are cited as persuasive but not controlling authority, they reflect that the proper inquiry is the length of evaluation while hospitalized. See United States v. Flanery, 879 F.2d 863 (4th Cir. 1989) (unpublished) (holding that the § 4241(d) "four-month period is for *determination* of the defendant's condition and does not include the time needed to file the evaluation with the court.") (emphasis in original). It is also not *per se* unreasonable if a period of hospitalization for purposes of evaluation exceeds four months by a *de minimis* amount. See United States v. Magassouba, 544 F.3d 387, 410-19 (2nd Cir. 2008) (custodial hospitalization for a few weeks in excess of four months was harmless when confinement was otherwise authorized by Bail Reform Act).

37

the total length of pretrial proceedings in this case due to competency issues, Tucker's counsel assured the court that "we have a very difficult case here, and I think we're doing it right," and "I don't think [Tucker is] being prejudiced."[23] (Doc. 108 at 96.) Therefore, to the extent Tucker objects to the length of time of his previous periods of evaluation, the court holds those arguments are waived by failing to previously object.

Furthermore, Tucker's contention that the court must evaluate his entire period of custody when determining reasonableness of his confinement is an incorrect statement of law. See Curbow 16 F.4th at 111 (explaining that the Fourth Circuit has not "held that the proper subject of the reasonableness inquiry was [the defendant's] entire period of custody."). Instead, the proper inquiry is whether the Government acted with "reasonable speed" to conduct the next step in the competency determination process. Id. at 112.

Here, Tucker faces a potential penalty of a mandatory statutory minimum of 15 years and a maximum of 30 years related to enticement of minors to engage in sexually explicit conduct for the purpose of producing visual depictions. The final resolution of his competency determination has been pending since October

---

[23] As previously discussed, in explaining their decision to forgo an objection, Tucker's counsel noted that "We can try [Tucker] any time. That ain't ever going away. . . . [I]t will always be there to get him a trial." (Doc. 117 at 65-66.)

2019, when the court stayed the involuntary medication order subject to his appeal. (See Doc. 76.) For over two years, therefore, neither the Government, nor the court, had any power to continue the proceedings absent a finding of competency. Had Tucker voluntarily taken his medication, and (once again, reportedly) restored his competency, the involuntary medication order would have been moot and his court proceedings would have continued.[24] Once the case was remanded on September 24, 2021, it was scheduled for a hearing on the matter within two weeks, following an updated Forensic Addendum and Treatment Plan, and was delayed thereafter only at the request and consent of both parties. (See Docs. 140, 142, 144, 146.); see also Wayda, 966 F.3d at 308 (explaining that a "reasonable period of time" under § 4241 allows for "reasonable explainable administrative delays"). Thus, any undue delay in these proceedings is not attributable to the Government, the BOP, or even this court.

---

[24] It is particularly relevant that Tucker has some control over this process as well. Should he be found unrestorable, FMC Butner has already determined he does not meet the criteria for commitment under § 4246. (See Doc. 133 at 16.) There is evidence in the record that, while allegedly restored to competency for periods of time, Tucker has nevertheless intentionally refused his medication to influence the proceedings. (See Doc. 108 at 80 ("So, you know, I went up to [the doctors], and I said, 'Look, I am going to stop taking [the medication] to get back in court if that's what it takes, because you're not letting me get back to court.' So that's why I stopped. I got back to court."); see also Doc. 108 at 80-81 ("I went into a treatment team, and their words were, 'Well, if you stop taking this medication, they're just going to find you incompetent.' And I was, like, 'well, I got to get back to court someway, somehow because they're not letting me.'"); Doc. 59 at 3 (documenting several attempts by Tucker to "cheek" the medication); Doc. 145 at 4-5 (refusing medication).)

Therefore, while this court has been keenly focused on trying to move this case forward, the court finds that the Government has acted with "reasonable speed" to complete the competency proceedings under § 4241, and Tucker's motion for release will accordingly be denied.

## III. CONCLUSION

For the reasons stated, the court finds that the Government has shown, by clear and convincing evidence, that involuntary medication under <u>Sell</u> is substantially likely to render Tucker competent to stand trial and substantially unlikely to cause side effects that will interfere significantly with Tucker's ability to assist counsel, and that an additional period to restore Tucker to competency through mental health treatment is warranted.

IT IS THEREFORE ORDERED that Tucker take the medication prescribed for him by Dr. Graddy, olanzapine 20 to 40 mg dissolvable tablet daily. (Doc. 59 at 5; Doc. 145 at 5.)

IT IS FURTHER ORDERED that the Government's motion to involuntarily administer medication (Doc. 64) is GRANTED as follows: If Tucker does not comply with his treatment plan despite this court's order, the Government may involuntarily administer 300 mg of olanzapine, injectable form, every 10 to 14 days as prescribed to him by Dr. Graddy. (Doc. 145 at 5.) If competency is restored, Tucker's medication shall be administered,

40

involuntarily if necessary and at this dosage, through disposition of his criminal charges, including trial.

IT IS FURTHER ORDERED that the treatment staff at FMC Butner are authorized to involuntarily perform any physical and laboratory assessments and monitoring which are clinically indicated to monitor for medication side effects in the event Tucker refuses or is unable to consent to any of these procedures.

IT IS FURTHER ORDERED that if Tucker shall be restored to competency, the Bureau of Prisons shall examine Tucker to determine his competency at the time of the offense, as set forth in this court's prior Order. (Doc. 38 at 7.)

IT IS FURTHER ORDERED that the Government's request for an additional period to restore Tucker's competency is GRANTED, and the Government shall be provided four months within which to do so. Because of the possibility that Tucker may decline further medication once released from BOP custody, should the BOP conclude that Tucker has restored competency within the period allowed and to avoid further regression, the BOP shall notify the court prior to his release from BOP custody so that appropriate steps may be taken to ensure that Tucker is transferred to a facility where he will remain compliant with his prescribed medication.

IT IS FURTHER ORDERED that this Forcible Medication Order is STAYED until such time as Defendant's appeal to the Fourth Circuit is resolved.

IT IS FURTHER ORDERED that Defendant's Motion for Release (Doc. 143) is DENIED.

IT IS FURTHER ORDERED that Tucker's motion to extend time for filing appeal (Doc. 44) is GRANTED, and his notice of appeal dated June 18, 2018 (Doc. 44 at 4) is deemed timely filed. The Clerk of Court is directed to transmit Tucker's pro se notice of appeal dated June 18, 2018, Doc. 44 page 4, to the Fourth Circuit.

                                    /s/   Thomas D. Schroeder
                                  United States District Judge
December 31, 2021